**ALLIED NUT AND BOLT, INC.**

**v.**

**NSS INDUSTRIES, INC.**

**Civil Action No. 95–4433.**

United States District Court,
E.D. Pennsylvania.

Jan. 17, 1996.

John A. Guernsey, Conrad, O'Brien, Gellman & Rohn, P.C., Philadelphia, PA, for Plaintiff.

Michael E. Scullin, Monteverde & Hemphill, Philadelphia, PA, Robert Forrest, John Trentacosta, Raymond and Prokop, P.C., Southfield, MI, for Defendant.

## *OPINION*

LOUIS H. POLLAK, District Judge.

The present case revolves around a contract dispute between two firms, Allied Nut and Bolt Co., Inc. ("Allied"), a Pennsylvania corporation with its principal place of business in Pennsylvania, and NSS Industries, Inc. ("NSS"), a Michigan corporation with its principal place of business in Michigan. Allied's complaint was filed on July 18, 1995. The complaint was brought under this court's diversity jurisdiction; it makes claims of breach of contract and misrepresentation against NSS, and seeks in excess of $50,000 in damages. Now before the court is a motion to dismiss, or in the alternative for a stay, by NSS. NSS's motion points out that, on June 15, 1995, NSS filed a suit against Allied in state court in Wayne County, Michigan, that was based upon the same sequence of events, and requests that this court, pursuant to *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), decline to exercise jurisdiction over the present case.

### I. *Facts*

The following recitation of facts is drawn from Allied's complaint (with certain exceptions, which are noted as they arise).

"In or about" January of 1990, Allied and NSS entered into an agreement under which Allied agreed to purchase all of its needs for domestically fabricated rapid tension bolts, washers, and nuts (which the complaint terms collectively "domestic rapid tension fasteners," and which I will call simply "fasteners") from NSS. Complaint, ¶ 5. In exchange, NSS agreed (1) to give Allied a 26% discount from its list price, a substantial cost savings to Allied; (2) to supply all of Allied's needs for fasteners; and (3) not to sell fasteners to any other distributor in Metropolitan New York, New Jersey, Pennsylvania, Delaware, and Maryland (to which the parties later added "three accounts in the New England states," Complaint, ¶ 6). Allied then terminated its purchase of the relevant type of fasteners from all other suppliers, and "expended time and effort in advertising its relationship with NSS," Complaint, ¶ 8.

Business relations between the parties then proceeded to deteriorate. "Almost from the beginning," Allied claims, it experienced "some difficulty" in receiving fasteners on time from NSS. Complaint, ¶ 9. By 1994, this had become a routine failure by NSS to ship product as ordered. NSS told Allied, variously, that it could not obtain raw materials, that the manufacture of fasteners was unprofitable, and, finally, that it was ending production of fasteners. Because of these difficulties, the dollar value of fasteners received by Allied from NSS, which had averaged $250,000 a year for 1991, 1992, and 1993, dropped to $100,000 in 1994. Allied therefore canceled some outstanding orders and contacted another fastener manufacturer. Because Allied had previously ended its dealings with that manufacturer (pursuant to Allied's agreement with NSS), the manufacturer was unwilling to give Allied any discount from list price. As a result, Allied's competitiveness suffered.

Since that time, Allied's complaint alleges, Allied has learned that NSS had not, as it claimed, gone out of the fastener business. Indeed, Allied alleges that it believes that NSS has sold fasteners to other distributors in the territory for which Allied had been NSS's exclusive distributer. Accordingly, on July 18, 1995, Allied filed a complaint in the Eastern District of Pennsylvania seeking damages for breach of contract and intentional misrepresentation.

■ Allied was not, however, the first to sue. On June 15, 1995, NSS filed suit against Allied in state court in Wayne County, Michigan. NSS's complaint in that action asserts that NSS began selling fasteners to Allied in 1990; that NSS has presented a statement of account to Allied; and that Al-

lied presently owes NSS $15,581.77, plus interest and costs.[1] NSS's complaint seeks to recover on theories of breach of contract, account stated, quantum valebant, unjust enrichment, and promissory estoppel. The complaint also seeks a declaratory judgment as to whether NSS has any continuing obligations to provide goods to Allied.

Allied filed an answer in the Michigan proceeding denying that Allied owed any amount to NSS. The answer also presents a series of defenses, including claims (1) that NSS's claims are barred because NSS misrepresented material facts, (2) that NSS committed the first material breach, and (3) that Allied "is entitled to a set-off and/or recoupment due to Plaintiff's breach of contract and/or misrepresentation of material facts." Motion to Dismiss, exh. 5.

Two further events have occurred in the Michigan proceeding that are relevant here. First, the Michigan court has entered a form scheduling order (it is unclear on precisely what date it did so) which scheduled, among other things, an exchange of witness lists for December 7, 1995 and a discovery cutoff for January 25, 1996. Motion to Dismiss, exh. 4. Second, after hearing oral argument on September 15, 1995, the Michigan court granted a motion by Allied to dismiss NSS's declaratory judgment claim with prejudice.[2] However, the Michigan court, in a later order, granted a motion by NSS seeking clarification of the previous order, and stated that the previous order "shall not act as a bar to NSS raising any defenses in this or any other pending case concerning the subject matter of the dismissed Count."[3]

## II. *Analysis*

 NSS now seeks dismissal of this action (or, in the alternative, a stay) under the *Colorado River* doctrine. That case permits a federal court, in "exceptional" circumstances, to stay or dismiss a case over which it would otherwise have jurisdiction for reasons of "wise judicial administration," including "conservation of judicial resources and comprehensive disposition of litigation." *Id.* at 818–19, 96 S.Ct. at 1247–48. There is, however, a strong presumption against the application of this doctrine, as the federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them." *Colorado River,* 424 U.S. at 817, 96 S.Ct. at 1246. The *Colorado River* Court was careful to avoid calling the doctrine that it applied one of abstention; courts applying the *Colorado River* doctrine have not always been so circumspect, however, *see, e.g., Trent v. Dial Medical of Florida, Inc.* 33 F.3d 217, 223 (3d Cir.1994). I will occasionally refer to *Colorado River* as an abstention doctrine here, although I recognize that—as I discuss below—the sources of the *Colorado River* doctrine are markedly different from those of the other doctrines that have been termed doctrines of abstention.

### A. *Duplicativeness*

 Before undertaking a *Colorado River* analysis, a district court must determine whether the actions involved are "truly duplicative." *Trent v. Dial Medical of Florida, Inc.* 33 F.3d 217, 223 (3d Cir.1994). "Generally, cases are parallel so as to justify abstention under *Colorado River* when they involve the same parties and claims." *Id.* The present cases involve the same parties, but the claims involved differ in one important respect: Allied has not explicitly brought the claims now before this court as counterclaims in the Michigan action. It has, however, raised essentially the same argu-

1. The Michigan complaint is appended to NSS's motion to dismiss, *see* Motion to Dismiss, exh. 1; this court may take judicial notice of it as it is a pleading in a court proceeding and as neither party has disputed its authenticity. *See E.I. Du Pont de Nemours & Co., Inc. v. Cullen,* 791 F.2d 5, 7 (1st Cir.1986).

2. Order Granting Defendant's Motion for Partial Summary Disposition, No. 95–517203–CK (Mich. Cir.Ct., Oct. 20, 1995). This order was not filed until October 20, 1995, and therefore was not appended to any of the pleadings. However, its existence was referred to in Allied's papers, and counsel for Allied transmitted a copy of the order to this court (and to opposing counsel) as an attachment to a letter dated November 8, 1995. NSS has not objected to the authenticity of this document. I will therefore order that it be docketed.

3. Order Granting Plaintiff's Motion for Clarification and Reconsideration, No. 95–517203–CK, slip op. at 2 (Mich.Cir.Ct., Nov. 3, 1995).

ments in the form of affirmative defenses (which assert, for example, that NSS committed the first material breach, that NSS misrepresented material facts, and that Allied is entitled to set-off and/or recoupment based upon NSS's breach of contract and misrepresentation).

■ The courts have been cautious in finding actions that are merely similar to be duplicative. "[T]he *Colorado River* doctrine does not give federal courts *carte blanche* to decline to hear cases within their jurisdiction merely because issues or factual disputes in those case may be addressed in past or pending proceedings before state courts." *United States v. SCM Corp.*, 615 F.Supp. 411, 417 (D.Md.1985). In particular, courts have found cases not to be duplicative when they involved different parties, *see Crawley v. Hamilton County Com'rs*, 744 F.2d 28, 31 (6th Cir.1984), different legal issues, *see New Beckley Mining Corp. v. Int'l Union, United Mine Workers of America*, 946 F.2d 1072, 1074 (4th Cir.1991), *cert. denied*, 503 U.S. 971, 112 S.Ct. 1587, 118 L.Ed.2d 306 (1992), *University of Maryland v. Peat Marwick Main & Co.*, 923 F.2d 265, 277 (3d Cir.1991), and different remedies, *see New Beckley Mining Corp.*, 946 F.2d at 1074. However, when a defendant in a state-court action fails to assert a compulsory counterclaim (that is, a counterclaim based upon the same transaction or occurrence as the claim against them), and instead brings that claim in federal court, the two cases are generally not meaningfully different. *See Bagdan v. Sony Corp. of America*, 767 F.Supp. 81, 83 (D.Vt. 1991); *Jackson Hewitt, Inc. v. J2 Financial Services, Inc.*, 901 F.Supp. 1061 (E.D.Va. 1995).

■ Allied's claims appear to be based upon the same transaction or occurrence as NSS's claims.[4] It follows that NSS's claims are compulsory counterclaims in the present action, or would be were this action to go forward. If Michigan's rules of civil procedure operated as do the Federal Rules, Allied's claims would, correspondingly, be compulsory counterclaims in the Michigan action. As it happens, it is not clear whether Michigan's rules of civil procedure in fact have that effect in the present case. The parties have not briefed this question, and its answer appears to involve certain factual uncertainties.[5]

■ However, I find that the present case is duplicative of the Michigan action irrespective of whether Allied's claims are compulsory counterclaims under Michigan law. In *Colorado River*, Justice Brennan was reluctant to term the doctrine he applied one of "abstention" because it did not issue from the concerns that underlie the abstention doctrines, considerations of "proper constitutional adjudication and regard for federal-state relations." Rather, he found, the doctrine of *Colorado River* derives from policies of "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" 424 U.S. at 817, 96 S.Ct. at 1246 (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952)); *see also Moses H. Cone*, 460 U.S. at 14–15, 103 S.Ct. at 936 (Brennan, J.) (restating this distinction). Under *Colorado River*, then, the proper standard for determining whether two actions are duplicative is not whether the jurisdictions involved consider them to be so, as it might be if the underlying doctrine was one of comity, but whether considerations of

---

**4.** "It also has been held that in a breach of contract action, a claim by defendant for overpayment or for the return of moneys paid is a compulsory counterclaim under Rule 13(a). Furthermore, in a suit for damages for an asserted breach of contract, a claim for payments due was a compulsory counterclaim." Charles A. Wright, Arthur R. Miller & Mary Kay Kane, 6 *Federal Practice and Procedure* § 1410 at 70–71 (1990).

**5.** Under Michigan law, "[g]enerally, a counterclaim arising out of the same transaction or occurrence as the principal claim must be joined in one action." *Salem Industries, Inc. v. Mooney Process Equipment Co.*, 175 Mich.App. 213, 437 N.W.2d 641, 642 (1988). However, Michigan's Rules of Civil Procedure provide that "[f]ailure to object in a pleading, by motion, or at a pretrial conference to improper joinder of claims or failure to join claims required to be joined constitutes a waiver of the joinder rules, and the judgment shall only merge the claims actually litigated." Rule 2.203(a)(2). It is not clear whether NSS has made such an objection.

"wise judicial administration" render it inappropriate for them to proceed separately. When, as is the case here, two actions arise from the same transaction and occurrence, involve the same parties, entail consideration of the same factual and legal issues, and seek essentially the same relief,[6] there is a sufficient risk that judicial resources will be consumed needlessly to warrant conducting the remainder of the *Colorado River* analysis. I will now proceed to conduct that analysis.

### B. *Appropriateness of Deferring to the Michigan Action*

In *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), Justice Brennan set forth a six-factor analysis to guide a district court's exercise of discretion under *Colorado River.* Those factors are: (1) whether one court has first obtained jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the state and federal courts obtained and exercised jurisdiction; (5) the source of the law that will provide the rules of decision; and (6) the adequacy of the state court proceeding to protect the parties' rights. *See Moses H. Cone,* 460 U.S. at 15–16, 21, 25–26, 103 S.Ct. at 936–37, 939–40, 941–42.

1. *Jurisdiction over Property.* Neither of the actions at issue here involves jurisdiction over property, so the first factor is not applicable here.

2. *Inconvenience of the Federal Forum.* The second factor weighs neither for nor against abstention. NSS, a Michigan corporation, would prefer to litigate in Michigan; Allied, a Pennsylvania corporation, would prefer to litigate in Pennsylvania. Thus, each of the two candidate fora would appear to be convenient to one party and less convenient to the other.

3. *Desirability of Avoiding Piecemeal Litigation.* This factor would appear to counsel deference by one of the two courts involved. Assuming that (1) there is no legal bar to Allied· raising its claims in the Michigan action (Allied has not indicated that there is any such obstacle), and (2) this federal action were to be stayed or dismissed, Allied could then proceed to assert its claims in Michigan, and what had been two lawsuits would then become one.

4. *Order in Which the State and Federal Courts Obtained and Exercised Jurisdiction.* The fourth factor, the order in which the two courts obtained and exercised jurisdiction, requires a somewhat more extended analysis. As the Court explained in *Moses H. Cone,* the principal focus of analysis under this factor should be which of the two actions has proceeded further, not merely which was filed first. *See* 460 U.S. at 21–22, 103 S.Ct. at 939–41. It appears that the Michigan action has proceeded somewhat further than has the action before this court; discovery has been under way in that action for some time, and an exchange of witness lists is scheduled for December 7, 1995. (It would not seem sensible to place much emphasis on this fact, however, as the principal reason that discovery has not similarly been under way in this action is the pendency of NSS's present motion.)

Allied also argues that the only reason that NSS was able to file its lawsuit first was that, when Allied made reasonable efforts to settle the dispute, NSS responded with a rush to the courthouse. In support of this claim, Allied presents a copy of a letter that it asserts it sent to NSS on May 17, 1995, which described Allied's grievances and stated that "[a] full explanation is in order or more formal action will be taken to address this matter." Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss, exh. A.[7] Allied asserts that it received no

---

**6.** I say "essentially" because Allied has only asserted its claim for money damages in the Michigan action in the form of a claim for set-off or recoupment.

**7.** Ordinarily, this court would be cautious in considering material extrinsic to the pleadings in ruling on an abstention question, as "a dismissal (without retention of jurisdiction) on abstention grounds is in the nature of a dismissal under Fed.R.Civ.P. 12(b)(6)." *Heritage Farms, Inc. v. Solebury Township,* 671 F.2d 743, 745 (3d Cir. 1982). However, had the plaintiff sought leave to amend its complaint to include the letter in question, leave would almost certainly have been granted. It therefore seems unnecessary to compel the plaintiff to take this formal step.

response to this letter. NSS says nothing about these events.

It is conceivable that evidence of this sort might suffice to negate the priority of a previously-filed state suit in some circumstances. In *Moses H. Cone,* the Court stated in dicta that an approach under which "the vexatious or reactive nature of either the federal or state litigation" can influence the decision whether to defer to parallel state litigation "has considerable merit." 460 U.S. at 17 n. 20, 103 S.Ct. at 937 n. 20. Allied has presented at least some evidence that the Michigan action was a pre-emptive strike of sorts: NSS apparently did not respond to Allied's efforts to resolve the case without resort to the courts, and instead simply filed suit.

■ But the race to the courthouse is, after all, a time-honored legal pastime, and such a race cannot be termed "vexatious" or "reactive" in the absence of some extrinsic sign that the state court suit was brought in bad faith. One such sign might be the "contrived" nature of the resulting litigation. Indeed, both of the appellate decisions cited in *Moses H. Cone,* as examples of analyses taking the "vexatious or reactive" nature of an action into account involved actions that the Court characterized as "contrived." *Id.* There is no indication in the present case, however, that the Michigan proceeding is contrived, and no extrinsic sign that NSS acted other than in good faith. Allied has not, therefore, succeeded in showing that the Michigan proceeding is of a "vexatious or reactive" character.

5. *Source of the Law that will Provide the Rules of Decision.* The claims of the two parties are state-law claims, but the present record provides such fragmentary information that it is impossible to determine whether the governing substantive law is that of Michigan or Pennsylvania (or—rather less likely—a third state's law; or—conceivably— the law of one state governing certain claims and the law of another state governing others). Without a copy of the contract (assuming there is a written contract) and some recital of the circumstances under which the contract was formed, one can as of now only conjecture what the governing substantive law would be. However, the substantive legal issues are not at all esoteric, so there is every reason to think that a Michigan court could, if occasion arose, readily cope with Pennsylvania (or other) law, and, in the alternative, that this court could cope with Michigan (or other) law. So the fact that we do not now know what substantive law will govern the various claims is not a real impediment to completing the *Colorado River* analysis.

6. *Adequacy of the State Court Proceeding to Protect the Parties' Rights.* Allied has not asserted that there is any legal reason that it cannot bring the claims it has brought before this court in the Michigan proceeding, and this court can discern no such reason. Thus, the Michigan proceeding would appear to be adequate to protect Allied's rights.

■ In *Moses H. Cone,* the Supreme Court made clear that "the decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." 460 U.S. at 16, 103 S.Ct. at 937. In the present case, the balance tilts in favor of dismissal. It is true that in terms of certain of the *Colorado River* factors this case can proceed equally well in either of the two possible fora: the two are equal in their convenience, or lack thereof, to the parties; all of the claims at issue appear to be cognizable in both courts; and, although we do not yet know what substantive law will be applicable, it would appear that the two courts are equally competent to determine the conflict of laws issues and, if need be, to apply another state's substantive law. But the Michigan forum was the first to obtain jurisdiction, and proceedings in that forum are more advanced than those here. Moreover, "wise judicial administration" counsels against piecemeal litigation; thus, I conclude that this is an instance in which *Colorado River* prompts deference to the other forum.[8]

---

8. I note that *Colorado River* and *Moses H. Cone* describe the multi-factor test that they set forth

The Supreme Court noted in *Moses H. Cone* that it made little difference whether an action was stayed or dismissed, as the plaintiff in a dismissed action would necessarily be granted leave to return to federal court, if required. *See* 460 U.S. at 27–28, 103 S.Ct. at 942–43. For ease of administration, I will order that this case be dismissed, but, in the (quite unlikely) event that it turns out that the Michigan proceeding is incapable of addressing all of Allied's claims, I will entertain an application by Allied for permission to re-file its complaint in this court.[9]

as one that permits an action to be stayed or dismissed only in "exceptional" circumstances. 424 U.S. at 818, 96 S.Ct. at 1246–47; 460 U.S. at 15–16, 103 S.Ct. at 936–37. At first glance, the present situation might not seem particularly "exceptional": there are duplicative lawsuits pending, one of which was filed first and has proceeded somewhat further. However, the courts' interest in conserving judicial resources is strong, and the present case is one which this court has no special mandate to hear, as it would if the case were one arising under federal law. Thus, I am satisfied that the present situation qualifies as "exceptional."

9. In that event, any questions as to the timeliness of the Allied suit will be addressed in the context of the complaint's initial filing, not the proposed re-filing of the complaint.