SAUDI BASIC INDUSTRIES CORPORATION, Individually And in the Name of, and On Behalf of, Al–Jubail Petrochemical Company, A Partnership, Plaintiff,

v.

**EXXONMOBIL CORPORATION, Defendant.**

Exxonmobil Corporation, Exxon Chemical Arabia, Inc., and Mobil Yanbu Petrochemical Company, Inc., Plaintiffs,

v.

Saudi Basic Industries Corporation, Defendant.

Civil Action Nos. 98–4897(WHW), 00–3841(WHW).

United States District Court, D. New Jersey.

April 3, 2002.

Jeffrey E. Lorell, Saiber, Schlesinger, Satz & Goldstein, LLC, Newark, NJ, Kenneth R. Adamo, Michael W. Vary, Leozino Agozzino, Jones, Day, Reavis & Pogue, Cleveland, OH, Cheryl L. Farine, Hudak & Shunk Co., L.P.A., Akron, OH, for Plaintiffs.

Elizabeth Sher, Pitney, Hardin, Kipp & Szuch, LLP, Morristown, NJ, James Quinn, Weil, Gotshal & Manges, LLP, New York City, David C. Weiner, Charna E. Sherman, Andrew S. Pollis, David J. Michalski, Hahn, Loeser & Parks, LLP, Cleveland, OH, K.C. Johnson, ExxonMobil Corporation, Houston, TX, for Defendant.

## AMENDED OPINION

WALLS, District Judge.

This is a complicated dispute concerning the alleged misuse of a patent and alleged overcharges of royalties to a partnership. In the first lawsuit, Civil Action No. 98–4897(WHW) ("NJ–I"), Plaintiff Saudi Basic Industries ("SABIC") moves to clarify or reform a March 10, 2000 Stipulation where it agreed not to practice a technology that is the subject of a patent dispute. SABIC also moves pursuant to Rule 12(c) for partial judgment on the pleadings to strike Defendant ExxonMobil's ("Exxon") defenses of unclean hands and setoff. Exxon cross-moves to dismiss the Complaint pursuant to Rule 19 for SABIC's failure to join necessary and indispensable parties. The motion for clarification or reformation of the March 10 Stipulation is denied; the motion for partial judgment on the pleadings pursuant to Rule 12(c) is also denied. Exxon's cross-motion to dismiss pursuant to Rule 19 is denied; SABIC is not required to join either ECAI or KEM-YA as an indispensable party.

In the second lawsuit, Civil Action No. 00–3841(WHW) ("NJ–II"), SABIC moves to dismiss the complaint of Exxon based on the Foreign Sovereign Immunities Act, as well as on other jurisdictional grounds. Exxon moves to consolidate the NJ–I and NJ–II actions into a single lawsuit. The motion to dismiss is denied; the motion to consolidate is granted.

## FACTS AND PROCEDURAL BACKGROUND

The claims asserted in this action have their origin in the late 1970's. Because of

the number of parties, at the outset it is useful to list them and their relationships to each other: SABIC is a Saudi Arabian corporation, owned 70% by the Saudi government and 30% by private investors, with its principal place of business in Saudi Arabia. Exxon is a New Jersey corporation with its principal place of business in Texas. Exxon Chemical Arabia, Inc. ("ECAI"), a Delaware Corporation with its principal place of business in Texas, is a wholly-owned subsidiary of Exxon Overseas Corporation, which itself is a wholly-owned subsidiary of Exxon. KEMYA is a 50/50 limited liability partnership formed between SABIC and ECAI under Saudi Arabian law to manufacture polyethylene. Mobil–Yanbu ("Yanbu") is a Delaware corporation with its principal place of business in Delaware.

In the 1970's, SABIC approached a number of potential partners about the possibility of forming joint ventures in Saudi Arabia to manufacture polyethylene. The negotiations culminated in the formations of two joint ventures in 1980; one with Yanbu, the other with ECAI. Exxon is not a direct party to either of these agreements.

The first joint venture was formed by SABIC and Yanbu on April 19, 1980, and created the Saudi–Yanbu Petrochemical Co. ("YANPET"). The second joint venture was entered into by SABIC and ECAI on April 26, 1980, and established the Al–Jubail Petrochemical Co. ("KEMYA"). Both YANPET and KEMYA are limited liability partnerships existing under the laws of Saudi Arabia, and in the business of manufacturing polyethylene in Saudi Arabia.

Exxon asserts that both joint venture agreements provide that the agreements, including their Annexes [1] "when executed", constitute the " *'whole agreement'* " between the Partners ..." (Joint Venture Agreement, Art. 18.1 (emphasis added)) So, according to Exxon, the December 22, 1980 Service Agreement that is the subject of the NJ–I action, is expressly incorporated into the joint venture agreements, creating a "single package" of rights and obligations. This overall scheme required participation by Exxon and Mobil (not just ECAI and Yanbu), and Exxon argues that all parties understood that Exxon and Mobil (now "Exxon") were intended to benefit from the joint venture agreements. SABIC strongly refutes this version of the facts and asserts that the Service Agreement and Joint Venture Agreements constitute separate agreements.

**NJ–I Action**

By its amended complaint, SABIC seeks a declaration that KEMYA has ownership rights in proprietary information, including trade secrets and U.S. Patent No. 5,352,749, by virtue of a December 22, 1980 Service Agreement between KEMYA and Exxon.

Pursuant to the Service Agreement, Exxon, acting through its unincorporated division Exxon Chemical Company ("ECC"), agreed to provide certain services to KEMYA from time to time, including engineering, administrative, and technical services related to construction of a petrochemical plant at Al–Jubail in Saudi Arabia. (Am.Compl.¶ 11.) Under the Agreement, processes or patents developed as a result of services provided under the agreement were deemed the property of KEMYA, subject to royalty-free licenses

---

**1.** The December 22, 1980 Service Agreement is an annex to the Joint Venture Agreement. Clause 10.1 of the Service Agreement provides: "The Agreement shall continue its force as long as the Joint Venture Agreement (*to which this Agreement is Annex VI* ) continues in full force and effect, or until a termination pursuant to Clause 11.1 of this Agreement." (emphasis added)

given to Exxon and its affiliates. The Agreement is governed by Saudi Arabian law.

In 1991, in an attempt to expand the capacity of its Al–Jubail petrochemical facility in Saudi Arabia, KEMYA requested that Exxon conduct a study of the plant reactors' ultimate capacity ("the URC study"). (Am.Compl.¶¶ 19–21.) In connection with that request, Exxon was given access to proprietary information belonging to KEMYA. *Id.* ¶ 22. SABIC alleges that such access occurred "well prior to the filing of the last of the patent applications that led to the '749 patent." The URC study was completed by July 1991.

SABIC claims that Exxon has improperly withheld the results of the URC study, as well as other aspects of KEMYA's operations, and violated the '749 patent. Further, SABIC alleges that in March 1992, Exxon filed an application for a patent concerning the subject matter of the URC study without authorization. In October 1994, the U.S. Patent and Trademark Office issued the '749 patent, entitled "Process for Polymerizing Monomers in Fluidized Beds," to the holding company Exxon Chemical Patents, Inc. ("ECPI") as assignee. That patent describes a method to increase polyethylene production through a process known as "Super Condensed Mode Technology" ("SCM–T"). SABIC charges that Exxon illegally licensed or otherwise conveyed rights in the '749 patent and other KEMYA trade secrets without permission.

In the NJ–I action, SABIC brings suit on behalf of KEMYA for breach of the Service Agreement and implied covenants, specific performance (delivery of the '749 patent and related trade secrets), misappropriation of trade secrets, conversion, tortious interference with prospective economic advantage, unfair competition, and unjust enrichment. SABIC has not joined the other partner, ECAI, as a plaintiff because in its view, ECAI as a subsidiary of Exxon, would not sue its related corporation.

SABIC claims that Exxon expressly acknowledged SABIC and KEMYA's right to contest Exxon's claim of ownership to the technology at issue here. (Am.Compl., Ex. A.) The NJ–I complaint alleges that SCM–T belongs to KEMYA, and that it was wrongfully misappropriated by Exxon. Exxon disputes this argument, and avers that it had a right to practice SCM–T. (Answer ¶ 10.)

### The NJ–II Action—Unipol License

On or about September 28, 1980, SABIC entered into an agreement with Union Carbide Corp. ("UCC"), to have the exclusive sublicense for a gas-phase process to manufacture polyethylene in Saudi Arabia. This technology is referred to as Unipol® process. In exchange for its exclusive license, SABIC pays UCC, among other things, a running royalty. (Del.Compl., ¶ 10.)

SABIC entered into two sublicense agreements with YANPET and KEMYA, effective October 15, 1980, which gave those partnerships the right to use Unipol process in their respective plants to manufacture polyethylene. Under the sublicense agreements, both partnerships were required to pay SABIC a running royalty.

In NJ–II, Plaintiffs Exxon, Yanbu and ECAI claim that SABIC overcharged the partnerships by collecting royalties at a higher rate than agreed upon (the "royalty overcharges").

### The Delaware Action

On July 24, 2000, SABIC filed a complaint against Yanbu and ECAI in the Superior Court of Delaware (Civil Action No. OOC–07–161–VAB) ("Delaware action"). SABIC's complaint seeks declaratory relief against these defendants solely on the issue of whether the royalty charges were proper under the joint ven-

ture agreements. As said, in NJ–II, Yanbu and ECAI have accused SABIC of "over-charging" both partnerships for royalties in violation of the joint venture agreements.

## DISCUSSION

■ SABIC and Exxon sharply disagree as to the nature of their overall contractual arrangements. As mentioned, they entered into a joint venture agreement in April 1980. The parties agree on this basic point, but disagree on everything that follows. According to Exxon, the joint venture agreement served as an overall operating agreement for the parties, incorporating any future agreements or amendments. SABIC denies this and argues that the April 26, 1980 Joint Venture Agreement, the subject of NJ–II, and the December 22, 1980 Service Agreement, the subject of NJ–I, are separate and distinct and should not be joined in the same action. The Court now sets forth the most plausible nature of the parties contractual relationship, for that determination guides much of the analysis to follow.

The April 1980 Joint Venture Agreement entered into by SABIC and ECAI described the parties' multiple responsibilities for the partnership arrangement to manufacture polyethylene in Saudi Arabia. The Court agrees with Exxon and finds that the Joint Venture Agreement provided the overall contractual arrangement between the parties. This view is enforced by Article 18.1 of the Joint Venture Agreement,[2] which clearly states that the Joint Venture Agreement includes "[a]nnexes hereto, when executed" which constitute the "whole agreement" between the par-

ties. The Joint Venture Agreement supersedes any other agreement or correspondence between the parties. Because the December 22, 1980 Service Agreement is "Annex VI" to the April 26, 1980 Joint Venture Agreement, it becomes part of the whole agreement between the parties. (Dec. 22, 1980 Service Agreement ¶ 10.1.)

With this in mind, the Court now analyzes each of the six motions brought by the parties in the NJ–I and NJ–II cases.

1. **MOTION TO CLARIFY OR REFORM THE MARCH 10, 2000 STIPULATION**

SABIC seeks to clarify, and if necessary, reform the March 10, 2000 Stipulation ("March Stipulation") wherein it agreed not to practice SCM–T. SABIC seeks permission for its affiliated plants to operate at the lower range of the supercondensed mode, namely an allowable usage of up to 22 wt.% condensed phase when manufacturing polyethylene.

**The March 10, 2000 Stipulation**

The March Stipulation arose from SABIC's motion to dismiss Count IV of Exxon's Amended Counterclaims: Exxon accused SABIC of breaching its fiduciary duty to KEMYA by encouraging certain SABIC affiliates, including SHARQ, to use SCM–T. SABIC moved to dismiss, and contended that it had not conveyed SCM–T information to affiliates, and that none, including SHARQ, had any intention of using SCM–T without proper authorization. Exxon agreed to a dismissal of Count IV's counterclaims based on SABIC's representations in the March 10, 2000 Stipulation which was signed as an Order of this Court on April 3, 2000.[3]

---

2. *See* Joint Venture Agreement Between Saudi Basic Industries Corporation and Exxon Chemical Arabia, Inc., Art. 18.1, "This Joint Venture Agreement, **including the Annexes hereto,** when executed, constitute the **whole agreement** between the Partners as to the matters herein set out and accordingly **super-**

sedes any previous agreement or correspondence between the Partners and any other related letters/agreements." (emphasis added)

3. In the March 10, 2000 Stipulation (later the April 3, 2000 Order), SABIC represented to Exxon that, "[n]either SABIC, SHARQ, Yan-

**Univation Agreements**

In April 1997, Exxon and UCC had formed a 50/50 joint venture, Univation, to commercialize, license and enforce SCM–T patents held by Exxon. The parties expressly agreed that SABIC could operate its recycle gas phase at or below 22 wt.%. (Agozzino Decl., Ex. A ¶ 12.02.) Schedule 12.02 identifies "SABIC" as the exempt licensee. (*Id.* at Schedule 12.02.)

According to SABIC, its management was unaware of the Univation Agreements and the fact that SABIC and its affiliates had been formally granted the right to practice "up to" 22 wt.% condensed. (Dr. Al–Ubaid Decl., ¶¶ 12, 13).

SABIC contends that as a result of this agreement, Exxon and UCC had covenanted between themselves and for Univation, that a limited portion of SCM–T patent rights (up to 22 wt.% condensed) would not be enforced by Univation against SABIC and its affiliates. SABIC's management later learned of the existence of these agreements.

Exxon contends that the Univation Agreements are immaterial to the present dispute and were produced long before the March Stipulation. According to Exxon, SABIC knew of the Univation Agreements before the Stipulation, and cannot now claim ignorance. In addition, "before summer", Dr. Al–Ubaid of SABIC knew of SHARQ's plans to practice over 17.4 wt.%. (Exxon Mem. In Opp'n to Mot. to Clarify ("Exxon Br.") at 8, *citing* 10/28/00 *Al–Ubaid Dep.* at 666.) However, SABIC did not notify Exxon or the Court of the breach of the March Stipulation.

Exxon argues that the Univation Agreements, despite assertions by SABIC, do not permit SABIC or SHARQ to operate between 17.4 and 22 wt.% condensed. Exxon argues: (1) that Schedule 12.02 of the Univation Agreements does not make any reference to SABIC's affiliates; (2) ¶ 12.02 of the Univation Agreements does not apply to SCM–T information at or below 22 wt.%; (3) nothing in the Univation Agreements (or in the law) supports SABIC's interpretation that SABIC or SHARQ is a third-party beneficiary; (4) ¶ 12.02 of the Agreements is neither a license nor a covenant not to sue. According to Exxon, the Univation Agreements are agreements between Univation and UCC and provide that Univation will not enforce the SCM–T patents in certain situations.

**Permission to Use SCM–T up to 22 wt.%**

Despite this Court's April 3, 2000 Order, SHARQ switched to higher condensed phase operations to cool its recycle gas. SHARQ decided to run plant tests up to 22 wt.% condensed as permitted by the Univation Agreements (but forbidden by the April 3 Order). SABIC claims that it did not know of SHARQ's plans until after the April 3 Order was executed.

SABIC then sought permission from KEMYA for SHARQ to operate at 22 wt.% because of its concern that KEMYA might be declared the owner of SCM–T instead of Exxon. Mr. Alaudah, the president of KEMYA, gave such permission (in exchange for a royalty) pending the outcome of this case. (*See* Exxon's Decl. of Elizabeth J. Sher ("Sher Decl."), Ex. P.)

Based on that permission, on August 1, 2000, SHARQ began running tests at lev-

---

pet ... nor any SABIC affiliate (other than KEMYA) have used or practiced SCM–T Information. SABIC further represents that neither SABIC, SHARQ, Yanpet ... nor any other SABIC affiliate (other than KEMYA) will use or practice the SCM–T Information until the ownership rights thereto are established and the owner expressly authorizes such use. ..." Whether the Stipulation should have been signed as an Order of the Court is the subject of a separate motion.

els up to 22 wt.%. The tests were apparently successful, because SHARQ started operating regularly at these levels. (Al-Ubaid Decl. ¶ 20). SABIC argues that the sole purpose of the March Stipulation was to preclude any basis for an accusation that SABIC had made or was planning to make some unauthorized use of SCM–T information transferred improperly from KEMYA. SABIC argues that the phrase "until ownership rights thereto are established" was included because SABIC did not then envision any possibility of such authorization being obtained until the litigation was resolved. SABIC believes that it has fully complied with the March 10 Stipulation and this Court's April 3 Order by obtaining contractual authority from everyone who could be an owner of the technology. SABIC states that no SCM–T information has been transferred to SHARQ.

As a result, SABIC seeks to reform or clarify the Stipulation to reflect SHARQ's right to practice SCM–T information up to 22 wt.% condensed. The March Stipulation and April 3 Order are silent about SHARQ's right to practice up to 22 wt.% condensed. At that time, SHARQ had informed SABIC that it did not intend to practice over 17.4 wt.% condensed. SABIC now cites a "business need" to practice SCM–T up to 22 wt.% condensed, and seeks a clarification and reformation of the stipulation to reflect this.

**Exxon's Argument**

Exxon argues that the March Stipulation should not be clarified or reformed for several reasons. First, Exxon says that SABIC was and is violating the March Stipulation by allowing its affiliate, SHARQ, to practice SCM–T information before ownership is determined. Exxon also argues that SABIC's argument that the Univation Agreements allowed other parties to use the technology only matters if SABIC *loses* this case, because if KEM-

YA owns SCM–T Information as SABIC contends in this lawsuit, then Univation or any other entity could not grant permission to use the technology.

Exxon alleges that in seeking "permission" for SHARQ to operate up to 22 wt.% condensed, SABIC engaged in improper *exparte* contacts with Mr. Alaudah. This was the subject of a series of submissions and hearings in August and September 2000 before Special Master Weiss on the subject of breach of the parties' agreement to avoid *exparte* contacts about the litigation with KEMYA employees. Exxon says that throughout these proceedings, SABIC failed to disclose its contacts with Mr. Alaudah and its imminent plans to practice SCM–T. SABIC has defended SHARQ's secret contacts with Mr. Alaudah, claiming that such contacts were "not related to the litigation," even though it now places these communications before the Court as evidence to justify the relief it seeks.

**1. The March Stipulation Prohibits SHARQ's Use of SCM–T Information and Is Enforceable.**

█ The March Stipulation is clear on its face as to the representations of SABIC: "... neither SABIC, SHARQ, YAN-PET, Petrokemya, nor any SABIC affiliate (other than KEMYA) will use or practice the SCM–T Information until the ownership rights thereto are established and the owner expressly authorizes such use." (March 10, 2000 Stip., 2) This Court disagrees with SABIC's assertion that the March Stipulation is ambiguous with regard to SHARQ's right to practice SCM–T Information.

SABIC's arguments that the Univation Agreements create rights for SABIC and its affiliates with regard to the SCM–T information are problematic for several reasons. First, there is little reason to believe that the Univation Agreements

were not available for review by SABIC before SABIC and Exxon entered into the March Stipulation. The documents were produced to SABIC four months before the March Stipulation. The Protective Order did not prevent a business designee from having access to these agreements. (*See* Sher Aff., Ex. E.) Therefore, this Court finds that SABIC's proclaimed ignorance of the terms within the Univation Agreements is unreasonable and suspect.

Also, it is unclear whether Schedule 12.02 of the Univation Agreements granted SHARQ rights to practice SCM–T information. Schedule 12.02 of the Agreement does not explicitly include SABIC's affiliates and SABIC has not asserted a compelling reason to find that the contract should be interpreted to include its affiliates.

Last, assuming that the Univation Agreements afforded rights to SHARQ to practice SCM–T information, Section 12.02 of these agreements was a statement of present intent between UCC and Exxon. There was nothing to preclude these two parties from amending the terms of the agreements so as to allow Univation to enforce the patents against SABIC.[4] This Court does not find the March Stipulation to conflict with the terms of the Univation Agreements. By the March Stipulation, SABIC agreed that SABIC and its affiliates would not use or practice the SCM–T Information until ownership rights were established and the owner expressly authorized such use. Exxon and UCC's earlier agreement not to enforce patent rights against SABIC does not relieve SABIC of its obligations under the March Stipulation. This Court finds that the March Stipulation is an unambiguous and enforceable agreement.

## 2. SABIC has failed to Demonstrate Permission.

 SABIC has also failed to demonstrate permission for use of the SCM–T information. KEMYA's ownership is far from certain. It is unclear that the President of KEMYA, Mr. Alaudah's, grant of permission to SHARQ for use of the SCM–T information was proper.

Exxon argues that the documents governing KEMYA's operations require Board approval for any offer to sell or dispose of property of the Partnership. Mr. Alaudah, president of KEMYA, did not disclose his discussions with SABIC to the other partner, and in doing so, failed to follow KEMYA's approval processes. This Court finds that SHARQ did not receive proper permission to practice the SCM–T information.

## 3. No Justification to Clarify or Reform the Stipulation

 There is substantial reason to deny clarification or reformation of the stipulation: SABIC's motion offers no legal basis to justify reformation. Contract law generally allows reformation only where necessary "to express the agreement [the parties intended.]" Restatement (Second) of Contracts § 155 (1979). While "mutual mistake" can justify reformation, unilateral mistake cannot. *See In Re Resorts International,* 181 F.3d 505, 512 (3d Cir.1999) (" 'unilateral mistake of a fact unknown to the other party is not ordinarily grounds for avoidance of a con-

---

4. SABIC argues that SABIC and its affiliates are third-party beneficiaries to these agreements. The question of whether SABIC and its affiliates were intended beneficiaries by the contracting parties will not be explored in this opinion. It is enough that the contract-ing parties had the ability to change the terms of the agreement according to their present intent and that the March Stipulation does not conflict with the terms of the Univation Formation Agreement to determine this motion.

tract.' "); *see also Coca–Cola Bottling Co. of Elizabethtown, Inc. v. Coca–Cola Co.*, 988 F.2d 386, 404 (3d Cir.1993), *cert. denied,* 510 U.S. 908, 114 S.Ct. 289, 126 L.Ed.2d 239 (1993) (same). SABIC has neither raised the issue of mutual mistake, nor pled any facts of mutual mistake about the meaning of the March 10, 2000 Stipulation.

■ Although there is an exception to the general principle denying relief for unilateral mistake when the non-mistaken party " 'knows or has reason to know of the unilateral mistake' ", *In re Allegheny International, Inc.*, 954 F.2d 167, 180 (3d Cir.1992) (citations omitted), here SABIC has not pled any facts of its "unilateral mistake", much less Exxon's knowledge of any unilateral mistake. Moreover, modification of a consent order "should not ordinarily be granted 'where a party relies on events that actually were anticipated at the time it entered into a decree.' " *Building & Constr. Trades Council of Philadelphia & Vicinity, AFL CIO v. NLRB*, 64 F.3d 880, 886 (3d Cir.1995)(quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 385, 112 S.Ct. 748, 760, 116 L.Ed.2d 867 (1992)).

■ This Court denies SABIC's motion to clarify or reform the March 2000 Stipulation because legal justification is absent. Unilateral mistake is not a basis for reformation of an Order. Since August 1, 2000, SABIC has been violating the April 3 Order by allowing SHARQ to practice SCM–T at levels of 22 wt.% condensed. A "business need" even if substantiated, is not a sufficient reason to ignore a Court Order. Because SABIC's motion is denied, Exxon's motion for expedited discovery on this issue is mooted.

**2. SABIC's Rule 12(c) Motions to Strike "Unclean Hands" and "Set Off" Defenses**

In the second of its NJ–I motions, SABIC moves to strike, pursuant to Fed. R. Civ. P 12(c), Exxon's unclean hands and "set-off" defenses because these defenses are allegedly based on a separate agreement.

**A. Standard of Review**

■ A motion for judgment on the pleadings under Rule 12(c) is appropriate when the moving party establishes on the face of the pleadings that it is entitled to judgment as a matter of law. *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir.1988); *Soc'y Hill Civic Ass'n v. Harris*, 632 F.2d 1045, 1054 (3d Cir.1980). The motion must be denied " 'unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law.' " *Ilan–Gat Eng'rs, Ltd. v. Shelter Sys. Corp.*, 879 F.Supp. 416, 419 (D.N.J.1994)(quoting *Hayes v. Cmty. Gen'l Osteopathic Hosp.*, 940 F.Supp. 54, 56 (3d Cir.1991)). The movant carries the heavy burden of establishing beyond doubt that "no relief can be granted under any set of facts that could be proved." *Taj Mahal Travel, Inc. v. Delta Airlines*, 164 F.3d 186, 189 (3d Cir. 1998); *Inst. for Scientific Info., Inc. v. Gordon & Breach, Sci. Publishers, Inc.*, 931 F.2d 1002, 1005 (3d Cir.1991)

■ In reviewing a 12(c) motion, the court must accept the nonmovant's allegations as true and view the facts and inferences in the light most favorable to the nonmoving party. *Jablonski*, 863 F.2d at 289–90; *Ilan–Gat Eng'rs.*, 879 F.Supp. at 419.

**B. Arguments**

■ Exxon first argues that because SABIC is relying on matters outside the pleadings, the summary judgment standard should be applied. However, because in motions for judgment on the pleadings, the Court may consider the pleadings and

any written instruments attached as exhibits, there is no need for conversion. *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 452 (7th Cir.1998). The Court may also consider any documents referred to in the pleadings, including any undisputedly authentic documents that the claim or defense is based upon. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993); *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 368 n. 9 (3d Cir.1993).

Because SABIC has relied on the contents of Exxon's pleadings, together with the documents expressly referenced therein, these motions will be analyzed under Rule 12(c).

### 1. The Unclean Hands Defense Relates to the Joint Venture Agreement.

 Under general principles of equity, " '[a party] who comes into equity must be with clean hands." *Heuer v. Heuer,* 152 N.J. 226, 238, 704 A.2d 913 (1998). Where a party has unclean hands with regard to the transaction at issue, the party cannot invoke the equitable powers of the Court. *See id.*

SABIC relies on the argument that Exxon's "unclean hands" defense arises out of two separate agreements between different sets of parties, with the crux of the NJ–I lawsuit being Exxon's alleged breach of the December 22, 1980 Service Agreement. In response, Exxon asserts that SABIC acted with "unclean hands" in allegedly overcharging KEMYA for royalty payments based on the October 15, 1980 agreement ("royalty overcharges" [5]). SABIC says that Exxon cannot do this be-cause the agreements described above are separate agreements.

As discussed above, this Court has determined that the NJ–I and NJ–II actions arise from one overall agreement. From that, the Court agrees with Exxon that SABIC has not met the high burden of establishing that relief could not be granted under any set of facts. SABIC's argument that the unclean hands defense should be stricken because it relates to a separate agreement is rejected.

### 2. Unclean Hands Defense Must Relate to Subject Matter of Complaint.

 The unclean hands defense must relate closely to the subject matter of the complaint. *In re New Valley Corp.,* 181 F.3d 517, 525 (3d Cir.1999)("the alleged inequitable conduct must be connected, i.e. have a relationship to the matters before the court for resolution"), *cert. denied,* 528 U.S. 1138, 120 S.Ct. 983, 145 L.Ed.2d 933 (2000). Properly viewed, the equitable maxim of unclean hands is a tool for the court, rather than a defense for the accused. *Sears, Roebuck & Co. v. Sears plc,* 744 F.Supp. 1297, 1309 (D.Del.1990) ("In actuality, a defendant's claim of unclean hands ... is not a defense at all. When presented with a claim of unclean hands, the court is primarily concerned with protecting its own integrity ...") The doctrine only comes into play when it is evident from the pleadings that the allegedly improper conduct is *directly related* to the conduct about which plaintiff complains, because only in such circumstances is the Court's equitable power implicated. *New Valley,* 181 F.3d at 525.

---

**5.** The royalty overcharge claims are the subject of two other actions. One, pending before this Court, *ExxonMobil Corp. v. SABIC,* (00–3841), is the subject of a motion to dismiss for lack of jurisdiction. The other is pending before the Superior Court of Delaware, *Saudi Basic Industries Corp. v. Mobil Yanbu Petrochemical Co.* (Civil Action No. OOC–07–161–VAB) which Exxon seeks to dismiss.

SABIC asserts that the contractual provision upon which Exxon bases its defense is separate, distinct and independent of the breach of contract claim raised by SABIC. When a party's equitable defense is not based upon a purported breach of a contractual provision at issue, such a defense may not serve to bar plaintiff's claims. *See Laborers' Int'l Union of North Am. v. Foster Wheeler Corp.*, 26 F.3d 375 (3d Cir.1994) (suit to compel arbitration under pre-hire agreement not barred by unclean hands because unclean hands premised on breach of different contractual provision).

However, this Court finds that there is a close enough relationship between the inequitable conduct and the claims in the lawsuit to give Exxon the opportunity to assert the defense. SABIC has not met its heavy burden of establishing beyond doubt that, "no relief can be granted under any set of facts that could be proved." *Taj Mahal Travel*, 164 F.3d at 189. The Court has already found that the Service Agreement and Unipol Agreement are part of the overall Joint Venture Agreement. The allegation by Exxon that SABIC has overcharged the joint venture in violation of the Joint Venture Agreement is conduct related to the breach of the same Joint Venture Agreement. SABIC's alleged unclean hands in overcharging the joint venture in NJ–II are directly relevant to its effort in NJ–I to invoke this Court's equitable powers and enforce obligations supposedly owed by Exxon. This alleged conduct by SABIC could be considered unconscionable conduct that permeates the transaction as a whole. *See Shell Oil v. Marinello*, 120 N.J.Super. 357, 392, 294 A.2d 253 (N.J.Super.L.1972) ("It is the effect of the inequitable conduct on the total transaction which is determinative whether the [unclean hands defense] shall or shall not be applied.").

### 3. Unclean Hands Defense Must Relate to the *Party* Alleged to Have Committed Wrongdoing.

SABIC's additional argument as to why the unclean hands defense should be stricken is that KEMYA is the real party in interest and the unclean hands defense is against SABIC. Because the unclean hands defense must relate to the *party* seeking that equitable relief, SABIC alleges that the unclean hands defense is improper.

Exxon argues that because SABIC is suing on behalf of KEMYA, there are no other partners against whom to assert the unclean hands defense. Even if KEMYA is innocent, SABIC's unclean hands would prevent it from suing derivatively on KEMYA's behalf. *See Gaudiosi v. Mellon*, 269 F.2d 873, 882 (3d Cir.1959); *Recchion v. Kirby*, 637 F.Supp. 1309, 1315–16 (W.D.Pa.1986) (holding that a shareholder with unclean hands cannot sue derivatively).

If SABIC as a derivative shareholder suing on behalf of KEMYA is found to have unclean hands, the Court finds that this wrongful conduct would bar SABIC from bringing the claims at issue. This view is well-established in case law. *Recchion* applied the doctrine of unclean hands to prevent plaintiff shareholder in a derivative action from complaining about the very conduct which he facilitated. The close connection between the plaintiff's own wrongful conduct and the wrongful conduct which was the basis of the derivative suit allowed the unclean hands defense to go forward. *Id.* at 1315–16. Similarly, in *Gaudiosi*, in a derivative action for equitable relief related to a disputed proxy contest, the wrongful conduct of one of the contestants in intimidating the other stockholders abstain from voting their shares allowed an unclean hands defense. *Gaudiosi*, 269 F.2d at 882.

### 4. Exxon's Standing to Assert the Royalty Overcharge Claim as Its Unclean Hands Defense

SABIC's final argument in support of its motion to strike the unclean hands defense is that Exxon lacks standing to assert the royalty overcharge claim because it is neither a party nor a third-party beneficiary of the Joint Venture Agreement between SABIC and ECAI. The Court dismisses this argument for the reasons expressed in the following discussion of the setoff defense.

### C. Setoff Defense

SABIC incorporates its previous *New Valley* argument that the lack of a close nexus between the defense and the complaint requires dismissal of the "setoff" defense and offers other arguments.

Setoff is a procedural device to allow a party to reduce the amount owed to an opposing party by the value of the opponent's cross-obligations to that party. *U.S. v. York*, 909 F.Supp. 4, 9 (D.D.C. 1995). "[A] party can have ... setoff rights only against one asserting claims against himself." *Nashville Lodging Co. v. Resolution Trust Corp.*, 59 F.3d 236, 246 (D.C.Cir.1995). The common law right of setoff is permissive, not mandatory. *See In re Monongahela Rye Liquors*, 141 F.2d 864, 869 (3d Cir.1944). It cannot be invoked when the general principles of equity would not justify it. *York*, 909 F.Supp. at 8.

The right to a setoff depends on the existence of mutual debts between the parties to the litigation. *Id.* at 9.; *see also, In Matter of Bevill, Bresler & Schulman*, 896 F.2d 54, 57–58 (3d Cir.1990) ("The right of setoff depends on the existence of mutual debts and claims between creditor and debtor."). In other words, direct privity of contract is required before any setoff may be claimed. *York*, 909 F.Supp. at 9.

### 1. SABIC's Arguments

### a. Privity Required for "Setoff" Defense

According to SABIC, Exxon lacks standing to assert a setoff for the alleged royalty overcharges, losses and damages suffered indirectly by ECAI, because Exxon was neither a party to the Univation Agreement, nor to the Joint Venture Agreement. The overcharges, even if proved, cannot create any obligation by SABIC to pay Exxon. In this situation, a setoff is barred. *Capuano v. U.S.*, 955 F.2d 1427, 1430 (11th Cir.1992) ("It goes without saying that neither party may offset moneys in its hands belonging to some other party.").

### b. Disagreement About Exxon's Third Party Beneficiary Status

SABIC also argues that Exxon lacks standing to assert "setoff" because it was not an intended third-party beneficiary of the KEMYA joint venture. For Exxon to have standing, it must demonstrate that it was an intended third-party beneficiary of the KEMYA joint venture. *Grant v. Coca–Cola Bottling Co.*, 780 F.Supp. 246, 248–49 (D.N.J.1991) ("[i]n order to qualify as a third-party beneficiary, the claimant must show that the contract was 'made for the benefit of [that] party within the intent and contemplation of the contracting parties'") (citations omitted). It must be more than "mere knowledge" that some third-party may incidentally benefit; rather, it must be a "motivating factor." *See Grant*, 780 F.Supp. at 249.

According to SABIC, not only has Exxon failed to plead the required facts, but has failed to demonstrate any basis for its standing to assert a setoff based on the alleged royalty overcharge, except to assert its corporate parent status of ECAI, the true party in interest. However, ECAI, says SABIC, is an independent cor-

poration, created under Delaware law, and a wholly owned subsidiary of Exxon Overseas Corp., an independent corporation, which is in turn a subsidiary of ExxonMobil. Exxon disputes this, and claims that it owns 100% of both companies, and therefore is the true "party-in interest."

Although Exxon is a grandparent company of ECAI, the corporate relationship, in and of itself, is not enough to confer standing. As a matter of law, Exxon as a distant parent to ECAI cannot demonstrate that it is an intended beneficiary because any benefit it receives as a parent (such as profits earned by the subsidiary) is indirect and incidental. *See Dow Corning v. Chem. Design, Inc.*, 3 F.Supp.2d 361, 365–66 (W.D.N.Y.1998). If Exxon cannot prosecute the royalty overcharge claim directly, it cannot do so indirectly by an affirmative defense or setoff.

Consequently if SABIC has overcharged KEMYA, any refund is owed to KEMYA, not to Exxon, a non-party to the Unipol transaction upon which the royalty overcharge claims are based. Such are the arguments of SABIC.

### 2. Exxon's Argument: SABIC has not met its burden

Exxon counters that SABIC's motion for partial judgment on the pleadings to dismiss Exxon's setoff defense must be denied absent a showing that Exxon can prove no set of facts that would sustain the defense.

Although Exxon asserts that it was an intended third-party beneficiary, it does not directly answer SABIC's charge that a grandparent is not a third-party beneficiary *per se*. *See In re Bacigalupi, Inc.*, 60 B.R. 442, 446 (9th Cir.BAP 1986) (stating that a setoff claim 'cannot fail for lack of mutuality' where complaint in other acts *alleges* third-party beneficiary status)

Exxon avers that its allegations as a third-party beneficiary suffice for purposes of this motion. *See Ilan–Gat Eng'rs*, 879 F.Supp. at 419. Exxon has expressly pled its third-party status (NJ–II Compl. ¶ 28), and argues that this suffices for its designation as a third-party beneficiary. *See Caldwell Trucking PRP Group v. Spaulding Composites Co.*, 890 F.Supp. 1247, 1252 (D.N.J.1995) (considering pleadings filed in other courts for purposes of 12(b)(6) motion).

Exxon argues that even beyond the pleadings, the facts demonstrate that it is a third-party beneficiary because the agreement names Exxon, and operates to its benefit. *See ESI, Inc. v. Coastal Corp.*, 61 F.Supp.2d 35, 73–74 (S.D.N.Y.1999) (holding that, although defendant was not a signatory to joint venture agreement, plaintiff could bring breach of contract claim against defendant where defendant participated in contract negotiations and drafting and had obligations related to joint venture).

Finally, Exxon argues that any questions of fact as to Exxon's third-party status cannot be resolved on a 12(c) motion, or a motion for summary judgment. *See Pension Fund–Mid Jersey Trucking Indus.-Local 701 v. Omni Funding Group*, 731 F.Supp. 161, 171 (D.N.J.1990) (denying motion for summary judgment in view of issues of fact of "whether parties were intended beneficiaries of contract"); *see also Consolidated Rail Corp. v. Portlight, Inc.*, 188 F.3d 93, 98 (3d Cir.1999) (denying 12(c) motion where pleadings contained no information on the factual question, and the factual record was still undeveloped).

### 3. Conclusion

 The Court finds that for purposes of this motion, Exxon's allegations of its third-party beneficiary status must be accepted and finds that Exxon has sufficiently pled its third-party status. This Court agrees with Exxon and finds that a question of fact as to Exxon's third-party status

cannot be resolved on a 12(c) motion for summary judgment. It is sufficient now for Exxon to have plead its third-party beneficiary status. The Court denies SABIC's Rule 12(c) motion.

### 3. EXXON'S MOTION TO DISMISS PURSUANT TO RULE 19

In the third NJ–I motion, SABIC purports to bring derivative claims on behalf of KEMYA asserting that Exxon is obligated under contract and tort law to assign the rights of SCM–T information to KEMYA. Yet, SABIC has failed to name ECAI, the other partner in KEMYA, as a defendant. Exxon disputes SABIC's right to sue derivatively on KEMYA's behalf, and has preserved its defenses related to SABIC's failure to name either KEMYA or ECAI as indispensable parties. Exxon now moves to dismiss SABIC's derivative claims pursuant to Fed.R.Civ.P. 19 for failure to join a necessary and indispensable party. Alternatively, Exxon requests that this Court grant SABIC a 14–day leave to cure its defective pleading by adding ECAI as a defendant.

Rule 19 sets out separate tests for determining whether a party is "necessary"[6] and "indispensable."[7] If the court finds that a party is a "necessary one," it should direct the plaintiff to amend its complaint to add the person. Failure to comply with such an order may result in dismissal of the plaintiff's action. *See Window Glass Cutters League of Am., AFL/CIO v. Am. St. Gobain Corp.*, 428 F.2d 353, 354 (3d Cir.1970); *Rainville Co. v. Consupak, Inc.*, 407 F.Supp. 221, 225 (D.N.J.1976). When joinder is not feasible, the action must be dismissed if the unnamed person is "indispensable." Courts which analyze joinder fully consider each factor listed in Rules 19(a) and 19(b) to determine whether joinder or dismissal is required. *See Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118, 88 S.Ct. 733, 741, 19 L.Ed.2d 936 (1968).

Exxon complains that SABIC has not named either ECAI or KEMYA as a defendant. SABIC responds that Exxon and ECAI are effectively the same entity because Exxon stands in ECAI's shoes. SABIC alleges that its failure to add ECAI is justified by the futility of asking ECAI to "sue its parent or otherwise take action contrary to Exxon's interests." (First Am. Compl. ¶ 9).

In derivative actions, a plaintiff should name the real party in interest to prevent the risk of dismissal.[8] Cases have

---

**6.** *See* Fed.R.Civ.P. 19(a):

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction ... shall be joined as a party in the action if (1) in the **person's absence complete relief cannot be accorded** ... (2) the person claims an interest ... and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations ...
(emphasis added)

**7.** *See* Fed.R.Civ.P. 19(b):

If a person described in subdivision (a)(1)-(2) ... cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, ... the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

**8.** *See* 7 Charles Alan Wright, et. al., *Federal Practice and Procedure* § 1615, at 230–31 (2d.

applied the same rule to partnerships and have dismissed derivative claims when the partnership was an absent party. *See Bankston v. Burch*, 27 F.3d 164, 167 (5th Cir.1994) ("the partnership is ... an ***indispensable*** party without whom the lawsuit should not go forward.").

In the Third Circuit, however, the rule has been modified such that "at least in certain cases, it is possible that a partnership's interest can be effectively represented in litigation by participation of its partners." *HB General Corp. v. Manchester Partners, L.P.*, 95 F.3d 1185, 1193 (3d Cir.1996).

In general, federal courts are extremely reluctant to grant motions to dismiss based on nonjoinder, and dismissal will be ordered only when the defect cannot be cured and serious prejudice or inefficiency will result. *See Provident Tradesmens Bank & Trust*, 390 U.S. at 118, 88 S.Ct. at 743 ("To say that a court 'must' dismiss in the absence of an indispensable party and that it 'cannot proceed' without him puts the matter the wrong way around: a court does not know whether a particular person is 'indispensable' until it had examined the situation to determine whether it can proceed without him."). With that in mind, the Court will determine whether ECAI or KEMYA are necessary and indispensable parties.

### A. Is Either ECAI or KEMYA[9] a "Necessary Party" under Rule 19(a)?

■ SABIC argues that KEMYA is not a necessary party because it meets none of the criteria of Rule 19(a): first, Kemya is not a party in whose absence "complete relief cannot be accorded." Fed.R.Civ.P. 19(a)(1). A decision in favor of SABIC (acting derivatively) for KEMYA would restore the misappropriated asset to KEMYA, and end this dispute. Alternatively, a decision in favor of Exxon would end the dispute by binding SABIC, KEMYA, and ECAI. KEMYA cannot file another claim without SABIC's express authorization, and a binding decision upon SABIC precludes this possibility. Also, ECAI is the only other partner, and it will not take action against its parent. *Ono v. Itoyama*, 884 F.Supp. 892, 899 (D.N.J. 1995) ("The Court may presume a 50% shareholder would not agree to initiate litigation against himself."). In SABIC's view, there can be complete relief without naming ECAI or KEMYA as defendants. This Court agrees with SABIC's argument.

Next, SABIC argues that the absent party's ability to protect its interest is not prejudiced. Federal Rule of Civil Procedure 19(a)(2) is intended to either allow an absent party to protect its interests in the event they differ from the parties already in the litigation, or to ensure that the existing parties adequately represent interests of the absent party. Also, joinder is not required when the party, even if joined, could not protect its own interests. Exxon's control over ECAI, coupled with the absence of any other partner to act on KEMYA's behalf, thwarts KEMYA's ability to act independently, so KEMYA is not prejudiced by its absence.

■ Rule 19(a)(2)(ii) provides that when non-joinder of the absent party could subject the other parties to "multiple, dou-

---

Ed.1986) ("the corporation on whose behalf a derivative action is brought is a necessary party upon which any decision is binding."); *see also Ross v. Bernhard*, 396 U.S. 531, 538, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970) (quote)

9. For purposes of this motion, the reader should assume that arguments regarding the addition of KEMYA as a party would also apply to arguments for adding ECAI as a party. This Court will not continue to reference both throughout this motion.

ble, or otherwise inconsistent lawsuits", joinder is necessary. *Hagstrom v. Breutman,* 572 F.Supp. 692, 701 (N.D.Ill.1983). It should be noted that Rule 19 protects only against inconsistent obligations, not inconsistent adjudications. *See RPR & Assoc. v. O'Brien/Atkins Assoc., P.A.,* 921 F.Supp. 1457, 1464 (M.D.N.C.1995). The Third Circuit agrees that Rule 19 is not triggered merely by inconsistent adjudications. *See Field v. Volkswagenwerk AG,* 626 F.2d 293, 301–02 (3d Cir.1980). (The mere risk that a defendant who has successfully defended against a party may be found liable to another plaintiff in a subsequent action does not necessitate joinder of all of the parties in one action.)

SABIC argues that there is no scenario under which ECAI could be exposed to inconsistent obligations: There are only two partners in KEMYA, ECAI (owned and controlled by Exxon) and SABIC. Because KEMYA cannot act without SABIC's express authorization, there is no risk of multiple lawsuits or inconsistent obligations.

Exxon counters that SABIC does not represent KEMYA's interests. Exxon points to three instances when SABIC's and KEMYA's interests have conflicted. First, SABIC offers SCM–T as a major advance over Unipol® technology, and asserts that it would have the automatic right to freely use and sublicense SCM–T, if it is determined to be owned by KEMYA. This conflicts with the spirit of the Unipol Agreement between SABIC and KEMYA, which allows KEMYA to license its major advances to SABIC and UCC, without allowing SABIC to sublicense them further. (SABIC/KEMYA UCC License XI.9, *Sher Aff.* Exh. C). SABIC is advancing a position that conflicts with KEMYA's interests, says Exxon.

Second, SABIC earlier conceded that SHARQ, its half-owned affiliate, and a direct competitor of KEMYA, is currently using SCM–T, in violation of the March Stipulation that "neither SABIC, SHARQ, YANPET, PetroKEMYA, nor any SABIC affiliate (other than KEMYA) will use or practice the SCM–T information until ownership rights are established." According to Exxon, SABIC's violation demonstrates that it has acted, and will continue to act against KEMYA's interests.

Third, SABIC's alleged overcharging of the KEMYA partnership and efforts to prevent Exxon from litigating the overcharge claims represent another example that SABIC has compromised KEMYA's interests. Exxon argues that KEMYA's interests will not be adequately protected unless either ECAI or KEMYA is joined.

The Court agrees with SABIC that complete relief could be accorded to the parties without KEMYA's presence and that KEMYA lacks interests that would leave the parties subject to inconsistent obligations. But, this Court finds that KEMYA does have independent interests with regard to its licensing relationships, as Exxon describes, that would make it a necessary party under Rule 19(a), "if feasible."

## B. Under Rule 19(b), All Indispensable Parties Must be Joined

SABIC does not agree that KEMYA and ECAI are necessary parties, so in its view, no further inquiry under Rule 19(b) is necessary. *See Janney Montgomery Scott v. Shepard Niles Inc.,* 11 F.3d 399, 405 (3d Cir.1993). ("A holding that joinder is compulsory under Rule 19(a) is a necessary predicate to a district court's discretionary determination under Rule 19(b) that the party is indispensable."). SABIC points out that even if ECAI is deemed "necessary," not all necessary parties are indispensable. *RPR & Assoc.,* 921 F.Supp. at 1463. The practical effect here is that if the Court finds ECAI or KEMYA

to be indispensable, their addition would destroy diversity jurisdiction and require the dismissal of this case.

■■■ When a necessary party who should be joined cannot be joined, the Court must analyze the factors in Rule 19(b) to determine whether to proceed without the absent party, or to dismiss the action.[10] If the merits can be determined without prejudice to the rights of the necessary but absent parties, a court of equity will strain hard to reach that result. *See Bourdieu v. Pacific Western Oil. Co.*, 299 U.S. 65, 70, 57 S.Ct. 51, 53, 81 L.Ed. 42 (1936) *reh'g denied*, 299 U.S. 622, 57 S.Ct. 228, 81 L.Ed. 458 (1936). "In determining whether a party is indispensable, the court must consider the practical potential for prejudice in the context of the particular factual setting...." *RPR & Assoc.*, 921 F.Supp. at 1463, *citing Provident Tradesmens Bank & Trust Co.*, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936.

SABIC suggests that the Rule 19(b) factors establish that KEMYA is not "indispensable." First, a decision on SABIC's derivative claim will not prejudice KEMYA or expose Exxon to multiple claims. Second, even if there were some conceivable risk to Exxon, there are measures by which such perceived risk can be averted or lessened. Fed.R.Civ.P. 19, Advisory Comment at 121. As example, injunctive relief could fully protect Exxon against risk of a later suit by SABIC. Third, a judgment rendered in KEMYA's absence would adequately resolve the dispute as to all parties, including KEMYA, on whose behalf the action was filed. Finally, neither SABIC nor KEMYA will have an adequate remedy if the action is dismissed for nonjoinder.

*H.B. General Corp.*, cited above, is instructive. That case addressed whether one partner in a limited partnership would be prejudiced by the absence of the partnership entity, because it could file its own identical claims against the defendant, thereby exposing it to multiple suits or inconsistent obligations. The Court initially determined that the partnership was a necessary party because of independent interests that it held. However, the Court, relying on pragmatic considerations, concluded that because there were only three partners, and there were no partners absent which might have an interest in suing the defendant, a decision against the plaintiffs fully protected the defendant, and no joinder was necessary.

Here, SABIC is the only partner able to prosecute the partnership's claims against Exxon. If SABIC loses on the merits, injunctive relief fully protects Exxon against further claims by SABIC on behalf of KEMYA. As SABIC argues, SABIC's derivative claim will not be prejudicial to KEMYA's interests or expose Exxon to multiple suits. Also, neither SABIC nor KEMYA has an adequate remedy if this action is dismissed for nonjoinder because of KEMYA Board deadlock. In light of these practical considerations, this Court finds that KEMYA is not an indispensable party in the context of Rule 19(b).

## C. Waiver of Any Contention that KEMYA is an Indispensable Party

■■■ SABIC argues that Exxon has waived any contention that KEMYA is an indispensable party. SABIC interprets Exxon's counsel's representation in open court, "[w]e don't take the position that

---

**10.** Courts are reluctant to grant motions to dismiss based on nonjoinder, and do so only when the material defect cannot be cured and serious prejudice or inefficiency will result.

*See RPR & Assoc.*, 921 F.Supp. at 1463, *citing Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118, 88 S.Ct. 733, 742, 19 L.Ed.2d 936 (1968).

KEMYA is an indispensable party," as waiving the Rule 19 claim (Comprehensive Lorell Decl. Ex. N). Exxon denies that this one statement constitutes waiver. It admits that counsel made the statement only because SABIC treated Exxon and ECAI as the same party. After SABIC reversed itself, and asserted that Exxon cannot represent ECAI's interests, it became clear that either ECAI or KEMYA must be joined.

Even though Exxon's counsel said what he said, the Federal Rules expressly declare that a party cannot waive the defense of failure to join an indispensable party.[11] "[A]n objection based on the absence of an indispensable party can be raised at any time, even by an appellate court ..." *Travelers Indem. Co. v. Household Int'l, Inc.*, 775 F.Supp. 518, 529 (D.Conn.1991).

An Illinois case advanced by SABIC, *National Acceptance Co. v. Wechsler*, 489 F.Supp. 642, 645 (N.D.Ill.1980), is not helpful because the court held that the party seeking joinder had *contractually* waived its right to join myriad other parties. *Id.* at 645. Exxon has never contractually agreed to waive its right to bring this motion. There has been no waiver of Exxon's joinder claim.

### D. Joinder and Diversity Jurisdiction

The Court surmises that SABIC does not seek to join ECAI or KEMYA because such joinder would destroy diversity jurisdiction—KEMYA and Exxon are Texas residents.

SABIC responds that even though both KEMYA and Exxon are Texas residents, courts have a duty in diversity cases to realign the parties according to their interests. *See Develop. Finance Corp. v. Alpha Housing & Health Care, Inc.*, 54 F.3d 156, 159 (3d Cir.1995) (Describing a "fundamental principle of federal jurisdiction that '[i]n determining the alignment of parties for jurisdictional purposes, the courts have a 'duty' to look beyond the pleadings and arrange the parties according to their sides in the dispute.' ") (*quoting Indianapolis v. Chase Nat'l Bank*, 314 U.S. 63, 69, 62 S.Ct. 15, 17, 86 L.Ed. 47 (1941)). Because KEMYA's interest is to seek enforcement of the Service Agreement— which SABIC contends on KEMYA's behalf that Exxon has breached—KEMYA should be aligned with SABIC as a plaintiff.[12]

Exxon concedes that adding either ECAI or KEMYA will destroy diversity because a partnership is deemed a citizen of each state where its partners are individual citizens. *Carden v. Arkoma Assocs.*, 494 U.S. 185, 195, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990); *HB General*, 95 F.3d at 1190 ("for diversity jurisdiction purposes, a limited partnership is considered a citizen of each state in which its partners ... are citizens"). KEMYA is a citizen of Saudi Arabia, where SABIC is incorporated, and of Texas, where ECAI has its principal place of business. Joinder of KEMYA would destroy diversity because both KEMYA and Exxon are citizens of Texas. *See VMS/PCA LP v. PCA Partners LP*, 727 F.Supp. 1167, 1169 (N.D.Ill. 1989).

When joinder of a partnership to a derivative suit is not feasible due to

---

11. *See* Fed.R.Civ.P. 12(h), Advisory Comm. Notes to 1966 Amendment ("It is to be noted that while the defenses specified in subdivision (h)(1) are subject to waiver ... the more substantial defenses of ... failure to join an indispensable party under Rule 19 ... are expressly preserved against waiver....")

12. *See Duffey v. Wheeler*, 820 F.2d 1161 (11th Cir.1987) (In a derivative action brought by one of two shareholders in a close corporation, court allowed corporation to be aligned with plaintiff, reversing lower court decision that corporation be named a nominal defendant.).

diversity requirements, the suit must be dismissed unless all partners are joined as parties to the suit. *HB General,* 95 F.3d at 1193. However, applying the Rule 19(b) factors here, the Court finds that neither KEMYA nor ECAI is an indispensable party because this Court in equity finds that any judgment rendered in the party's absence will be adequate and not prejudicial to such absent parties since each is represented by 50% partners SABIC and Exxon (as grandparent to ECAI) in this lawsuit. Furthermore, SABIC will not have an adequate remedy if this action is dismissed for non-joinder. Neither ECAI or KEMYA will be considered and added as indispensable parties. Diversity jurisdiction remains.

### 4. SABIC's Motion to Dismiss the NJ–II Complaint under the Foreign Sovereign Immunities Act (FSIA)

In NJ–II, SABIC moves to dismiss the complaint claiming immunity as a foreign state under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et. seq.,* lack of personal jurisdiction and improper venue. Alternatively, SABIC argues that the court should abstain from exercising jurisdiction even if jurisdiction exists. Further, SABIC asks the Court to dismiss ExxonMobil as a third-party plaintiff because it lacks standing to assert the third-party beneficiary claims. In the event that the complaint survives, SABIC contends that the jury demand should be stricken.

### A. Standard of Review

Unlike a motion to dismiss for failure to state a claim pursuant to Fed. R.Civ.P. 12(b)(6), in a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), no presumption of truthfulness attaches to the allegations in the complaint and the court may consider matters outside the pleadings such as affidavits and other material prop-

erly before the court. *Mortensen v. First Federal Savings & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). In a Rule 12(b)(1) motion, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Mortensen,* 549 F.2d at 891. "[T]he existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Id.* at 891. The plaintiff must not only demonstrate that a controversy existed at the time it filed suit but that it continues to exist throughout the litigation. *Spectronics Corp. v. H.B. Fuller Co.,* 940 F.2d 631, 635 (Fed.Cir.1991). A motion to dismiss for lack of subject matter jurisdiction predicated on the legal insufficiency of a claim may be granted if the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or ... is wholly insubstantial and frivolous." *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1408–09 (3d Cir.), *cert. denied,* 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991)(quoting *Bell v. Hood,* 327 U.S. 678, 683, 66 S.Ct. 773, 90 L.Ed. 939 (1946)).

### B. Subject Matter Jurisdiction

SABIC contends that this court lacks subject matter jurisdiction under both of the grounds that Exxon asserts. SABIC argues that this Court lacks diversity jurisdiction under 28 U.S.C. § 1332 and original jurisdiction under 28 U.S.C. § 1330, the Foreign Sovereign Immunities Act.

### 1. Diversity Jurisdiction

As SABIC argues, diversity jurisdiction does not exist in this case. Section 1332 confers diversity jurisdiction upon "a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States." It is undisputed

that SABIC, an entity of which approximately 70% is owned by the Kingdom of Saudi Arabia (Al–Ubaid Decl. ¶ 3), qualifies as a "foreign state" under the definition of 1603(a).[13] However, because SABIC is not the party plaintiff, Section 1332 would not confer jurisdiction. (Compl.¶ 5). *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 437 n. 5, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) (1976 amendments to § 1332 eliminated diversity jurisdiction over "foreign state" defendants). As explained by the Supreme Court in *Argentine Republic*, " '[s]ince jurisdiction in actions against foreign states is comprehensively treated by the new section 1330, a similar jurisdictional basis under section 1332 becomes superfluous.' " *Id.* (citing H.R.Rep., at 14, S.Rep., at 13, U.S.Code Cong. & Admin. News 1976, p. 6613).

### 2. Original Jurisdiction Under the FSIA

SABIC further argues that this Court lacks original jurisdiction over this matter because of immunities SABIC claims under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. 1602 et. seq. The FSIA "establishes a comprehensive framework for determining whether a court in this country, state or federal, may exercise jurisdiction over a foreign state." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610, 112 S.Ct. 2160, 2164, 119 L.Ed.2d 394 (1992). The FSIA grants district courts subject matter jurisdiction over actions against "foreign states" pursuant to 28 U.S.C. § 1330(a), which provides that "district courts shall have original jurisdiction without regard to the amount in controversy of any nonjury civil action against a foreign state" as to any claim for which "the foreign state is not

entitled to immunity under sections 1605–1607 of this title...." The FSIA provides the "sole basis" for obtaining jurisdiction over a foreign sovereign in U.S. state and federal courts. *Id.*

Section 1604 of the FSIA provides that a foreign state shall be immune from the jurisdiction of U.S. federal and state courts, unless one of several statutory exceptions applies. 28 U.S.C. § 1604. When immunity under the FSIA is contested, the following burden-shifting analysis should be applied:

> [O]nce the defendant presents a prima facie case that it is a foreign sovereign, the plaintiff has the burden of going forward with showing that, under exceptions to the FSIA, immunity should not be granted, *Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F.Supp. 289, 293–4 (S.D.N.Y.1987), although the ultimate burden of persuasion remains with the alleged foreign sovereign. *Forsythe v. Saudi Arabian Airlines Corp.*, 885 F.2d 285, 289 n. 6 (5th Cir.1989).

*Drexel Burnham Lambert Group Inc. v. Committee of Receivers for A.W. Galadari*, 12 F.3d 317 (2d Cir.1993) (quoting *Cargill Int'l S.A. v. M/T PAVEL DYBENKO*, 991 F.2d 1012, 1016 (2d Cir.1993)); *see also Voest–Alpine Trading USA Corp. v. China New York Branch*, 142 F.3d 887, 896 (5th Cir.1998). As stated, it is undisputed that SABIC is a "foreign state" as defined by the FSIA. 28 U.S.C. § 1603(a). This Court will examine the applicability of exceptions to jurisdictional immunity under the FSIA.

### 3. Exceptions to Immunity

Section 1605 contains the disputed exceptions to sovereign immunity, commonly

---

**13.** *See* 28 U.S.C. § 1603(a) and (b). ("An 'agency or instrumentality of a foreign state' means any entity ... (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof ...' ")

known as the "waiver" and the "commercial activities" exceptions:

> (a) A foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case—
>
> > (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;
> >
> > (2) in which the action is based upon a commercial activity carried on in the United States by a foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States . . .

28 U.S.C. § 1605(a)(1)-(2).

### a. Waiver Exception is Narrowly Construed.

As quoted, 28 U.S.C. § 1605(a)(1) provides that a foreign state shall *not* be immune from suit if the foreign state " . . . waived its immunity either *explicitly or by implication* . . . ." (emphasis added). Here there was no express waiver of immunity. *See Aquinda v. Texaco,* 175 F.R.D. 50, 52 (S.D.N.Y.1997), *vacated on other ground sub. nom. Jota v. Texaco, Inc.,* 157 F.3d 153 (2d Cir.1998) (To establish express waiver, there must be a "clear, complete, unambiguous and unmistakable" manifestation of a sovereign's intent to waive its immunity.); *see also Libra Bank Ltd. v. Banco Nacional De Costa Rica, S.A.,* 676 F.2d 47, 49 (2d Cir.1982). At issue here is whether there was an implied waiver of immunity.

■ Implied waiver has generally been limited to three categories: (1) when the foreign state has agreed to arbitration in another country; (2) when a foreign state has agreed that the law of a particular country shall govern a contract; or (3) when a foreign state has filed a responsive pleading in an action *without raising the defense of sovereign immunity.* *Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.,* 179 F.3d 1279, 1291, n. 24 (11th Cir.1999)(emphasis added). "The courts, loath to broaden the scope of the implied waiver provision, rarely have found that an action that does not fit one of the above three examples constitutes an implicit waiver." *Id.*

■ Exxon first argues that SABIC waived its immunity with its filing of the Delaware action that involved claims based on the same issues here, whether SABIC overcharged KEMYA and YANPET in breach of the Joint Venture Agreements. Relying on *Matter of Rio Grande Transp., Inc.,* 516 F.Supp. 1155, 1159 (S.D.N.Y. 1981), SABIC argues that the mere filing of the Delaware action does not waive SABIC's immunity from suit elsewhere. According to SABIC, if Yanbu and ECAI wish to assert affirmative claims "arising out of the transaction or occurrence" as the subject matter of the Delaware action, they may only do so under 28 U.S.C. § 1607(b). 28 U.S.C. § 1607(b) provides that foreign states cannot assert immunity with respect to any **counterclaim** "arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state." On that basis, SABIC asserts that Delaware is the only forum in the United States where Unipol royalty claims may be litigated. Exxon counters that SABIC has waived its immunity under Section 1605(a)(1) because *nothing in the statute supports SABIC's view that it*

can waive sovereign immunity on a state-by-state basis.

This Court agrees with Exxon that SABIC cannot waive sovereign immunity on a state-by-state basis. SABIC points to no authority to support the assertion that only Delaware would have subject matter jurisdiction over this matter because of SABIC's waiver of immunity.

Moreover, in *In re Oil Spill by Amoco Cadiz [Republic of France v. Standard Oil Co.]*, 491 F.Supp. 161(N.D.Ill.1979), the district court rejected a foreign state's argument that the mere filing of a complaint does not constitute waiver, and found that defendant had waived by implication its foreign state immunity to third-party claims under section 1605(a)(1). *Id.* at 167–168. There was an implied waiver because the foreign state had "[invoked] the jurisdiction of the United States to adjudicate claims which arose [outside the U.S.]" and because the claims at issue were based on the same transactions or occurrences as claims previously filed in U.S. courts by the foreign state. *Id.* And, as Exxon argues, the case offered by SABIC, *In the Matter of Rio Grande Transp., Inc.*, 516 F.Supp. 1155 (S.D.N.Y. 1981), is not applicable because it involved a unique procedural rule that required the foreign state to file a conditional claim within six months of the plaintiff's claims. The foreign state defendant filed a conditional claim clearly asserting that the claim was to be considered only if its sovereign immunity defense was rejected. Here SABIC voluntarily began actions in two U.S. courts, and in the Delaware state action, seeks declaratory relief on the overcharge issue, the subject here.

Exxon also argues that SABIC waived its immunity by filing the NJ–I action. *See* 28 U.S.C. 1607(b); *Matter of Rio Grande Transport, Inc.*, 516 F.Supp. 1155, 1159 (S.D.N.Y.1981). According to SABIC, the filing of the NJ–I action alleging patent misappropriation does not serve to waive SABIC's immunity from suit on subjects which do not arise out of the occurrence of that patent misappropriation. And SABIC argues that the only claims that Exxon (not Yanbu or ECAI) may file against SABIC in New Jersey are narrow counterclaims which are statutorily limited and circumscribed.[14]

This Court has already determined that the NJ–I, NJ–II and the Delaware action are based upon breaches of one overall agreement. Based on that determination, the filing of the NJ–I action waives SABIC's immunity from suit on the claims in NJ–II and the Delaware courts. In the NJ–I action, Exxon asserted various counterclaims. However, SABIC **never raised** sovereign immunity in response to such counterclaims, and expressly conceded jurisdiction under 28 U.S.C. § 1332 thereby evincing an intent to waive any sovereign immunity. This Court concludes that failure to raise sovereign immunity in the first responsive pleading constitutes an implied waiver. *See Aquamar*, 179 F.3d at 1291 ("Congress in enacting the FSIA, contemplated that a private attorney representing a foreign state could waive sovereign immunity implicitly by filing, on behalf of the state, a responsive pleading that did not raise the defense," *citing* H.R.Rep. No. 94–1487, at 18 (1976)).

**14.** 28 U.S.C. § 1607 provides: "In any action brought by a foreign state ... in a court of the [U.S.] or of a state, the foreign state shall not be accorded immunity with respect to any counterclaim—(a) for which a foreign state would not be entitled to immunity under section 1605 ... had such claim been brought in a separate action against a foreign state; or (b) arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state; or (c) to the extent that the counterclaim does not seek relief exceeding in amount or differing in kind from that sought by the foreign state."

**404**

Because SABIC has repeatedly invoked the protection of U.S. courts, including this Court, for claims against Exxon on the very same agreements among the very same parties, this Court determines that immunity under the FSIA has been waived by implication.

### b. "Commercial Activity" Exception

 Exxon contends that the first and third clauses of Section 1605(a)(2) apply and defeat any jurisdictional immunity that SABIC has under the FSIA. Section 1605(a)(2) provides that a foreign state shall not be immune in any action based upon:

> a commercial activity carried on in the United States by a foreign state; or upon an act performed in the [U.S.] in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the U.S. in connection with a commercial activity of the foreign state elsewhere and ... causes a **direct effect** in the [U.S.].

28 U.S.C. § 1605(a)(2).

As written, Section 1605(a)(2) provides that a foreign state shall not be immune from the jurisdiction of the United States in any case in which the action is based upon "a commercial activity carried on in the United States by the foreign state." Under Section 1603(e), the "commercial activity carried on in the United States by a foreign state" means "commercial activity carried on by such state and having substantial contact with the United States." 28 U.S.C. § 1603(e). "Commercial activity" is defined as "either a regular course of commercial conduct or a particular commercial transaction or act," "the commercial character [of which] shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

This Court must determine whether SABIC's cause of action here was "based upon" commercial activity that had "substantial contact" with the United States. Exxon states that its breach of contract and fiduciary duty claims are based upon the following commercial activity in the U.S. by SABIC: (1) SABIC contracted with UCC, an American corporation, for exclusive rights to Unipol technology in Saudi Arabia; (2) the payments under this contract with UCC were made in New York for technology that SABIC had passed along to KEMYA and YANPET at a higher cost; (3) the failures to disclose had occurred during multiple KEMYA and YANPET Board Meetings that occurred in the U.S.; (4) payments from KEMYA and YANPET to SABIC for their rights to use Unipol technology were routed through banks in the United States en route to SABIC's accounts in Saudi Arabia.

SABIC counterargues that the commercial activity upon which Exxon relies is not a necessary element of their claim for breach of contract and fiduciary duty claims and does not meet the "based upon" requirement under the Act. (Al–Ubaid Decl. ¶¶ 6–7). The Supreme Court in *Saudi Arabia v. Nelson,* 507 U.S. 349, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993), described "based upon" as "read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." 507 U.S. at 357, 113 S.Ct at 1477. "[A] claim is 'based upon' events in the United States if those events establish a legal element of the claim." *Santos v. Compagnie Nationale Air France,* 934 F.2d 890, 893 (7th Cir.1991). This Court agrees with SABIC that Exxon's claims are not based upon commercial activity alleged to have occurred in the U.S. Exxon is claiming that SABIC had breached the Joint Venture Agreements and its fiduciary duty in overcharging royalties under two license agree-

ments at a cost in excess of what was agreed upon under the Joint Venture Agreements. These two license agreements and the Joint Venture Agreements were all executed under, and are governed by, Saudi Arabia law. According to SABIC and undisputed, "[t]he costs incurred by SABIC to acquire and license the technology to KEMYA and YANPET were incurred in Saudi Arabia, and the payments SABIC received from both partnerships came to its bank in Saudi Arabia." (SABIC Reply Br. at 17.)

SABIC's failure to disclose the overcharge practice to their ECAI and Mobil Yanbu counterparts at KEMYA and YANPET board meetings that occurred within the United States does not constitute an "act" that occurred within the United States. *See Chemarketing Indust., Inc. v. C.V.G.*, No. 97 CIV. 1791, 1998 WL 199937 at *3 (S.D.N.Y April 23, 1998)(failure to open a letter of credit cannot constitute an act that occurred in the United States). Further, the facts that UCC was an American corporation and that SABIC directed payments to UCC to New York are related to (as argued below, with respect to personal jurisdiction) but are not the activities upon which Exxon's legal claim is based. That YANPET and KEMYA's payments to SABIC were routed through the United States do not constitute substantial contact with the U.S. as required by the exception.

■■■■ Exxon next argues that any immunity that SABIC has under the FSIA is defeated by the exception found in the third clause of Section 1605(a)(2): a foreign state shall not be immune in any case in which the action is based "upon an act outside the territory of the [U.S.] in connection with a commercial activity of the foreign state elsewhere and that act causes a *direct effect* in the [U.S.]" 28 U.S.C. § 1605(a)(emphasis added). This clause requires the following elements to be satisfied to avoid immunity under the FSIA:

"(1) an act outside the [U.S.] (2) in connection with commercial activity outside the [U.S.] (3) that causes a direct effect in the [U.S.]." *Voest–Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887, 894 (5th Cir.1998).

Exxon claims that the direct effect exception applies because SABIC entered into and breached Joint Venture Agreements with two American corporations, ECAI and Yanbu, causing Plaintiffs and Exxon, a third-party beneficiary, great financial loss. Exxon argues that if any money is owed, such is owed directly to ECAI and Yanbu. SABIC does not contest that the complaint is based upon SABIC's acts with regard to these alleged overcharge practices and that these acts were in connection with commercial activity outside the U.S.

However, in SABIC's view, mere economic loss to an American plaintiff arising from a breach of performance occurring outside the U.S. is not a "direct effect." *See Dominican Energy Ltd., Inc. v. Dominican Republic*, 903 F.Supp. 1507, 1515 (M.D.Fla.1995). According to SABIC, the financial loss to ECAI and Yanbu was not direct because SABIC overcharged KEMYA and YANPET, not ECAI and Yanbu.

Exxon counters that the contractual obligations at issue are directly owed to ECAI and Yanbu and that the technicalities of corporate structure cannot be used to negate direct effect. Also, Exxon argues that SABIC's assertion that "mere economic loss" to an American plaintiff does not satisfy the "direct effect" requirement conflicts with many cases in which courts have found that economic injury to U.S. entities constituted a "direct effect" in the U.S. *See, e.g., Voest–Alpine*, 142 F.3d at 897 ("we hold that a financial loss incurred in the United States by an American plaintiff, if it is an *immediate consequence* of the defendant's activity, consti-

tutes a direct effect sufficient to support jurisdiction under the third clause of the commercial activity exception" (emphasis added)); *Ampac*, 797 F.Supp. at 977 (finding that based on allegation in complaint that American Defendants would suffer injury to business reputation and lose profits in the U.S., that the "harm alleged follows as an 'immediate consequence' of Defendants' activities".)

The Second Circuit in *Texas Trading* has noted:

> Unlike a natural person, a corporate entity is intangible; it cannot be burned or crushed. It can only suffer financial loss. Accordingly, the relevant inquiry under the direct effect clause when plaintiff is a corporation is whether the corporation has suffered a 'direct' financial loss.

647 F.2d at 312; *see also Tifa Ltd. v. Republic of Ghana*, 692 F.Supp. 393, 403 (D.N.J.1988) (finding direct effect due to plaintiff's financial loss from non-payment for goods, even though the money owed by the Ghanaian government was to be paid in Ghana through an intermediary Ghanaian corporation); *Crimson Semiconductor, Inc. v. Electronum*, 629 F.Supp. 903, 907 (S.D.N.Y.1986) (finding exception applied "because the breach had a 'direct effect' in the United States, namely, a financial loss suffered by the beneficiary of the contract, a New York corporation.").

Also, with regard to the "direct effect" exception, the leading case, *Weltover*, 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394, "teaches that the effect in the United States need only be slight." *Id.* at 618, 112 S.Ct. at 2168; *Ampac Group, Inc. v. Republic of Honduras*, 797 F.Supp. 973, 977 (S.D.Fla.1992). The effect need not be "substantial" and "foreseeable." *Weltover*, 504 U.S. at 618, 112 S.Ct. at 2168. Rather, an effect "is 'direct' if it follows as an *immediate consequence* of the defen-

dants' ... activity.' " *Id.* (emphasis added); *see also Ampac*, 797 F.Supp. at 977.

The facts of *Weltover* illustrate how slight the effect could be to constitute "direct effect." The *Weltover* bond holders brought a breach of contract action against the Republic of Argentina and its central bank arising out of Argentina's unilateral extension of the time for payment on the bonds issued as part of a currency stabilization plan. *Id.* at 609–10, 112 S.Ct. at 2163–2164. The District Court denied Argentina's motion to dismiss for lack of subject matter jurisdiction, and held that Argentina was not immune under the FSIA. The Court of Appeals affirmed. The Supreme Court defined "commercial activity" that is an exception to immunity under the FSIA: "[W]hen a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA." *Id.* at 614, 112 S.Ct. at 2166. Employing that definition, the Court found that Argentina was engaging in "commercial activity" when it unilaterally issued its bonds. *Id.* at 617, 112 S.Ct. at 2167. The Supreme Court also addressed whether Argentina's activities had a "direct effect" in the United States: Because the holders of the bonds could designate New York as one of several locations as the place of repayment, the rescheduling of those obligations necessarily had a "direct effect" in the United States." *Id.* at 619, 112 S.Ct. at 2168.

This Court finds that contrary to SABIC's assertion, there is no requirement of a "legally significant act in the U.S. beyond a financial loss" to satisfy the direct effect requirement. *Voest–Alpine*, 142 F.3d at 894 (refusing to ascribe a "legally significant act" requirement to the direct effect test); *see generally, Weltover*, 504 U.S. at 618, 112 S.Ct. at 2168. This Court con-

cludes that ECAI, Yanbu, and Exxon's financial loss suffices for "direct effect" such that the commercial activity exception applies, abrogating SABIC's foreign sovereign immunity.

### B. Personal Jurisdiction

SABIC further argues that Exxon's complaint should be dismissed because this Court lacks personal jurisdiction.

### 1. Consent to Personal Jurisdiction

■ This Court finds that SABIC consented to personal jurisdiction in New Jersey when it filed the NJ–I action in 1998. As discussed, NJ–I is based on claims arising from the same overall transaction as the matter here. It follows then that SABIC's initiation of litigation in this forum state on claims arising out of the same transaction surrenders any objection to personal jurisdiction by SABIC. *Gen'l Contracting & Trading Co. v. Interpole, Inc.*, 940 F.2d 20, 23 (1st Cir.1991) (By availing itself of the benefits of the New Hampshire courts by instigating a lawsuit against the plaintiff, "it is inevitable that [the defendant] surrendered any jurisdictional objections to claims that [the plaintiff] wished to assert against it in consequence of the same transaction or arising out of the same nucleus of operative facts."); *see generally, Adam v. Saenger,* 303 U.S. 59, 67–68, 58 S.Ct. 454, 82 L.Ed. 649 (1938) (rejecting plaintiff's jurisdictional objections to counterclaims filed by defendant, the court held: "The plaintiff having, by his voluntary act in demanding justice from the defendant, submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes for which justice to the defendant requires his presence.")

SABIC refers to *Aaron Ferer & Sons Co. v. Atlas Scrap Iron & Metal Co.,* 558 F.2d 450 n. 8 (8th Cir.1977), *Whistler Corp. v. Solar Elecs., Inc.,* 684 F.Supp. 1126,1131 (D.Mass.1988), and *Sullivan v. Rilling,* No. 94 c 539, 1996 WL 26840 *5 (N.D.Ill. Jan. 22, 1996) to support its proposition that, "as a matter of law, the filing and prosecution of a lawsuit does *not* constitute the requisite minimum contacts to establish personal jurisdiction." (SABIC's Mem. In Support of Mot. at 22.) However, unlike our situation here and there in *General Contracting,* the cases offered by SABIC do not deal with a former suit initiated by the defendant on claims arising out of a common transactional core. Because of this Court's conclusion that SABIC has consented to personal jurisdiction in this forum, a long arm analysis is unnecessary. That said, in further support of the existence of personal jurisdiction, this Court will conduct the analysis.

### 2. Minimum Contacts

#### a. Standard

■ Pursuant to Federal Rule of Civil Procedure 4(e), federal "district courts have personal jurisdiction over non-resident defendants to the extent authorized under the law of the forum state in which the district court sits." *Sunbelt Corp. v. Noble, Denton & Assoc., Inc.,* 5 F.3d 28, 31 (3d Cir.1993). New Jersey's long arm statute provides for personal jurisdiction as far as permitted by the Fourteenth Amendment to the United States Constitution. *See N.J. Court Rule* 4:4–4(c); *Carteret Savings Bank, FA v. Shushan,* 954 F.2d 141, 145 (3d Cir.1992); *DeJames v. Magnificence Carriers, Inc.,* 654 F.2d 280, 284 (3d Cir.1981). The question of whether this Court has jurisdiction over the defendant is determined by federal constitutional law. *See Mesalic v. Fiberfloat Corp.,* 897 F.2d 696, 698 (3d Cir.1990).

The Fourteenth Amendment permits a state to exercise jurisdiction over an out-of-state defendant only when "the defendant purposefully avails itself of the privi-

lege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958)). It is the plaintiff's burden to prove that the defendant has purposefully availed himself of the forum state. *See Burke v. Quartey*, 969 F.Supp. 921, 924 (D.N.J.1997).

To prove purposeful availment, a plaintiff may rely upon a defendant's specific contacts with the forum state. Personal jurisdiction pursuant to such contacts is known as specific jurisdiction. Specific jurisdiction is invoked when a claim is "relate[d] to" or "arises out of" the defendant's contacts with the forum. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984); *Dollar Sav. Bank v. First Sec. Bank of Utah*, 746 F.2d 208, 211 (3rd Cir.1984).

 A court must first determine whether the defendant had the minimum contacts with the forum necessary for the defendant to have "reasonably anticipate[d] being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980) (citations omitted). What constitutes minimum contacts varies with the "quality and nature of the defendant's activity." *Hanson*, 357 U.S. at 253, 78 S.Ct. at 1240, 2 L.Ed.2d 1283. In assessing the sufficiency of minimum contacts for personal jurisdiction, the court must focus on " 'the relationship among the defendant, the forum and the litigation.' " *Keeton v. Hustler*, 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984) (citations omitted). Otherwise stated, there must be at least "a single deliberate contact" with the forum state that relates to the cause of action. *United States*

*Golf Ass'n v. United States Amateur Golf Ass'n*, 690 F.Supp. 317, 320 (D.N.J.1988). The unilateral acts of the plaintiff, however, will not amount to minimum contacts. *Helicopteros*, 466 U.S. at 414, 104 S.Ct. at 1872; *Hanson*, 357 U.S. at 253, 78 S.Ct. at 1239–40.

Second, assuming minimum contacts have been established, a court may inquire whether "the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' " *Burger King*, 471 U.S. at 476, 105 S.Ct at 2184 (quoting *Int'l Shoe Comp. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945)); *Pennzoil Products Co. v. Colelli & Assoc., Inc.*, 149 F.3d 197, 201 (3d Cir.1998).

 Even if a non-resident has sufficient minimum contacts with the forum, the exercise of jurisdiction must still comport with "traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316, 66 S.Ct at 158. To determine the fairness and reasonableness of the forum's exercise of jurisdiction, it is necessary to consider the "burden on the defendant, the interests of the forum state and the plaintiff's interest in obtaining relief." *Asahi Metal Indus. Co., v. Superior Court of California*, 480 U.S. 102, 113, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987). The *Asahi* Court cautioned that "[t]he unique burdens placed upon who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long-arm of personal jurisdiction over national borders." *Id.* at 114, 107 S.Ct at 1033.

28 U.S.C. 1330(b) provides: "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction [when one of the exceptions to foreign sovereign immunity in §§ 1605–1607 applies] where service has been made under section 1608 of this title." This Court has established

through its discussion of the waiver and commercial activity exceptions under § 1605 that subject matter jurisdiction exists. As long as proper service has been made (an issue not in dispute) and the requirements of due process satisfied, this Court has personal jurisdiction. *See Weltover v. Republic of Argentina,* 753 F.Supp. 1201, 1207 (S.D.N.Y.1991).

■■■■ A foreign state is entitled to the same constitutional due process protections as natural persons. *Walpex v. Yacimientos Petroliferos Fiscales Bolivianos,* 712 F.Supp. 383, 390 (S.D.N.Y.1989) (citing *Texas Trading,* 647 F.2d at 307); *Unidyne Corporation v. Aerolineas Argentinas,* 640 F.Supp. 354, 360 (E.D.Va.1985). Instead of requiring "minimum contacts" with a state, the analysis of minimum contacts with a foreign sovereign is nationwide. *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 490, 103 S.Ct. 1962, 1969, 76 L.Ed.2d 81 (1983); *Texas Trading,* 647 F.2d at 314; *Ruiz v. Transportes Aereos Militares Ecuadorianos,* 103 F.R.D. 458, 459–460 (1984). Furthermore, statutory personal jurisdiction for a foreign state is not limited to specific jurisdiction but general jurisdiction as well. *See Walpex,* 712 F.Supp. at 390.

**b. Analysis**

■■ A court has specific jurisdiction over a defendant when that defendant has "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that *'arise out of or relate to'* those activities.'" *Burger King Corp.,* 471 U.S. at 472, 105 S.Ct. at 2182, 85 L.Ed.2d 528. The Court finds that SABIC is subject to specific jurisdiction based on its contacts in this country that are related to the activities upon which this litigation is based. SABIC sent representatives to the U.S. Board meetings of KEMYA and YANPET where the alleged failure to disclose the overcharges

occurred. (Sher Aff. ¶ 13). By SABIC's instructions, some of the payments from KEMYA and YANPET to SABIC under the SABIC–KEMYA sublicense passed through United States banks. Also, SABIC's payments to UCC, an American Corporation, under the Unipol Agreement took place in New York (Sher Aff., ¶¶ 5–6). As Exxon argues, evidence of payments by SABIC to UCC is related to the claims here because the alleged overcharges result from the differential between KEMYA and YANPET's payments to SABIC and SABIC's payments to the UCC. Further, Exxon alleges in the First Amended Complaint that some of the discussions between SABIC, Exxon, Mobil, ECAI and/or Mobil Yanbu before the Joint Venture Agreements took place in the U.S.

For personal jurisdiction to comport with "fair play and substantial justice," it must be reasonable to require the defendant to defend the suit in the forum state. *See World–Wide Volkswagen, Corp. v. Woodson,* 444 U.S. at 292, 100 S.Ct at 564. To determine reasonableness, a court considers the following factors: the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering substantive social policies. *Id.* Only in "rare cases [do the] 'minimum requirements inherent in the concept of 'fair play and substantial justice' ... defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities.'" *Asahi Metal Indust. Co., Ltd. v. Superior Court of Cal., Solano County,* 480 U.S. at 116, 107 S.Ct at 1034 (quoting *Burger King,* 471 U.S. at 477–478, 105 S.Ct at 2184–2185.).

Not only did SABIC engage in deliberate activities in the United States related to the claims here, but SABIC also purposefully availed itself of the protection of the U.S. laws by filing the NJ–I and Delaware actions. Consequently, SABIC could reasonably anticipate being hauled into Court, especially since it was SABIC who originally hauled Exxon into this district court. Based upon the fact that SABIC is litigating two other lawsuits in the United States, one of which is in this forum, this Court concludes that it is not overly burdensome for SABIC to litigate this matter here. Because NJ–I and NJ–II involve claims related to an overall agreement, this Court has determined that the most efficient and convenient resolution of this matter would be to keep NJ–II in this forum and consolidate it with the NJ–I action (as further explained in this opinion). For these reasons, this Court finds that the personal jurisdiction of the matter comports with "fair play and substantial justice."

From allegations in the First Amended Complaint ("FAC"), this Court opines that further jurisdictional discovery may uncover evidence of SABIC's "continuous and systematic" contacts with the U.S. to support general jurisdiction. (FAC ¶ 13.) However, this Court finds that further discovery on this ground is unnecessary because of this Court's determination that personal jurisdiction exists through SABIC's consent to personal jurisdiction and because of this Court's specific jurisdiction over this matter.

## C. Venue

SABIC also urges that Plaintiffs' complaint be dismissed for improper venue. 28 U.S.C. § 1391(f), which governs venue in actions against foreign states, provides:

A civil action against a foreign state as defined in § 1603(a) of this title may be brought—

(1) in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated;

(2) in any judicial district in which the vessel or cargo of a foreign state is situated, if the claim is asserted under § 1605(b) of this title;

(3) in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as defined in § 1603(b); or

(4) in the [U.S.] District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.

SABIC argues that venue is improper in New Jersey because no events relating to plaintiffs' claims occurred here; there is no vessel or cargo here, and SABIC is neither licensed to conduct, nor does it conduct any business in New Jersey. SABIC argues that the only proper venue is the District of Columbia under § 1391(f)(4) because a transfer to cure improper venue may be made only "to any district or division in which [the case] could have been brought." 28 U.S.C. § 1406(a).

Exxon retorts that venue is proper because SABIC is doing business in New Jersey. As quoted above, subsection (3) of 28 U.S.C. § 1391(f) states that venue is proper if the foreign state is "in any judicial district in which the agency or instrumentality is *licensed to do business or is doing business* ..." (emphasis added.) SABIC's 1999 Annual Report demonstrates that it has a facility in Wayne, New Jersey, through which it presumably distributes goods. (FAC, ¶¶ 13, 15; *see* Sher. Aff., ¶ 7, Ex. A). According to the FAC, SABIC has regularly sent its employees to

technology exchange meetings at UCC's Bound Brook, New Jersey facility and has frequently communicated with UCC personnel there. (FAC, ¶ 15) SABIC has also contracted with New Jersey corporations, including Exxon for various projects (*Id.*, ¶¶ 1, 13).

Exxon also argues that SABIC waived its right to object to venue when it filed the NJ–I action in this Court in 1998. *Harris Corp. v. Nat'l Iranian Radio & Television*, 691 F.2d 1344, 1349 (11th Cir. 1982); *see also* H.R.Rep. No. 94–1487, at 32 (1976) reprinted in 1976 U.S.C.C.A.N. 6604, 6631.

SABIC reminds us that "doing business" has been defined in this district as " 'engaging in transactions there to such an extent and of such a nature that the state in which the district is located could require the corporation to qualify to 'do business' there' ". *Vivadent (USA), Inc. v. Darby Dental Supply Co., Inc.*, 655 F.Supp. 1359, 1362 (D.N.J.1987) (quoting *Johnson Creative Arts v. Wool Masters*, 743 F.2d 947, 954 (1st Cir.1984)). SABIC argues that its activities in New Jersey are not of the extent to which New Jersey would require it to qualify to "do business" here.

■ First, it should be noted that the *Vivadent* and *Johnson* consider "doing business" as applied in section 1391(c), which relates to foreign corporations rather than a foreign state as defined under the FSIA. Second, it should be recognized that a new section 1391(c) was adopted in 1988 which changed the requirement to "any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C.A. § 1391(c), as amended by Act of Nov. 19, 1988, Pub.L. 100–702, § 1013, 102 Stat. 4624, 4669. And, this Court does not agree with the test proposed by SABIC of "doing business" for reasons well-articulated by Wright, Miller and Cooper:

The licensing standard that the First Circuit chose . . . has literally nothing to do with place of suit or protection against an inconvenient forum. The rules on when a state may require a foreign corporation to qualify if it wishes to do business there are derived from the Commerce Clause. One of the consequences of the licensing standard the First Circuit has adopted is that a corporation will never be found to be 'doing business' for purposes of § 1391(c) it is doing a wholly interstate business within the state. This will prevent § 1391(c) from being used in many cases involving extensive activity by a corporation within the district.

15 Federal Practice and Procedure, § 3811 at 121 (footnotes omitted).

This Court finds that the business activity described by Exxon is sufficient to meet the "doing business" requirement under § 1391(f). Additionally, because SABIC chose to litigate NJ–I here, the "underlying venue principles of fairness and convenience" are served by retaining venue in the matter. *Eason v. Linden Avionics, Inc.*, 706 F.Supp. 311, 327 (D.N.J.1989).

Venue is proper in this district; this Court has jurisdiction over SABIC. SABIC's motions to dismiss based on a lack of subject matter jurisdiction, personal jurisdiction and improper venue are denied. Exxon's separate motion for discovery to establish the jurisdictional issues has been rendered moot.

### D. Abstention

SABIC next argues that under the abstention doctrine to avoid concurrent litigation, this Court should abstain from hearing the NJ–II action because it is allegedly duplicative and wastes judicial resources.

Some background is necessary: SABIC filed the NJ–I action alleging patent mis-

appropriation in this Court in 1998. In July 2000, it filed a lawsuit in Delaware state court involving the same parties, but seeking declaratory relief that the royalty charges to Yanbu and ECAI were proper under the Joint Venture Agreements. Exxon filed the NJ–II action in August 2000, only a few weeks after the Delaware Action, claiming that the royalty charges violated the Joint Venture Agreements by allegedly overcharging Yanbu and ECAI millions of dollars. SABIC's premise for its abstention argument is that these are all different, unrelated lawsuits, and that abstention is desirable to allow the Delaware Action to proceed. However, this Court has already found that the claims and defenses in the NJ–I, II and Delaware actions are all part of the same overall agreement, such that they should be heard together.

Nevertheless, SABIC wants this Court to abstain in favor of allowing the Delaware action to proceed for reasons of alleged "sound judicial administration." For the reasons that follow, this Court will not abstain.

### 1. *Colorado River* Abstention

■ In *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), the Supreme Court held that abstention is justified only when "exceptional" circumstances support a federal district court's decision to abstain out of deference to parallel state-court litigation. *Colorado River,* 424 U.S. at 818, 96 S.Ct. at 1246. *Colorado River* and its progeny emphasize that the mere duplicativeness of parallel state and federal litigation is insufficient to justify abstention on the part of a federal district court. " '[Generally] . . . the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal Court having jurisdiction.' " *Id.* at 817, 96 S.Ct. 1236 (quoting *McClellan v. Carland,* 217 U.S. 268, 282,

30 S.Ct. 501, 505, 54 L.Ed. 762, 767 (1910)). Rather, "the task is to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice under *Colorado River* to justify the *surrender* of that jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co.,* 460 U.S. 1, 25–26, 103 S.Ct. 927, 942, 74 L.Ed.2d 765 (1983).

*Colorado River* identified four factors a federal court should consider when determining whether to abstain from jurisdiction: (1) whether one court first obtained *in rem* (or *quasi in rem*) jurisdiction over property involved in that litigation; (2) "inconvenience of the federal forum"; (3) "desirability of avoiding piecemeal litigation"; and (4) "the order in which jurisdiction is obtained by the concurrent forums." *Colorado River,* 424 U.S. at 818–819, 96 S.Ct. at 1247. *Moses Cone* added two additional factors to consider: (1) whether federal or state law applies; and (2) adequacy of state court proceeding. *Moses Cone,* 460 U.S at 23–27, 103 S.Ct. at 941–942. In considering these factors: "the decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction. The weight to be given to any one factor may vary greatly case from case, depending on the particular setting of the case." *Id.* at 16, 103 S.Ct. 927.

There is no dispute that this matter parallels the action filed in Delaware. Generally, pending actions in state and federal court are "parallel" when the cases involve "the same parties and claims." *Ryan v. Johnson,* 115 F.3d 193, 196 (3d Cir.1997). Here the NJ–II and Delaware actions involve the same parties (Yanbu and ECAI), and involve identical claims—

adjudication of whether SABIC has over-charged Yanbu and ECAI in their royalty payments, in violation of Art. 6.3 of the respective Joint Venture Agreements and whether SABIC has properly charged KEMYA and YANPET under each of their Unipol sublicenses for the use of Unipol® process. Although NJ–II and the Delaware action are parallel, the *Colorado River* factors discussed below require this Court not to abstain.

### a. Jurisdiction over Property

Neither of the actions involves *in rem* or *quasi in rem* jurisdiction over property; this factor is inapplicable. *Allied Nut and Bolt, Inc., v. NSS Indus.*, 920 F.Supp. 626, 631 (E.D.Pa.1996).

### b. Inconvenience of the Forum

SABIC points out that Yanbu is a Delaware corporation and maintains its principal place of business in Wilmington, Delaware. Also, ECAI is a Delaware corporation, with its principal place of business in Texas. According to SABIC, neither Yanbu or ECAI is inconvenienced by the need to litigate in Delaware. Indeed, Delaware was the *only* forum where SABIC could sue both of these parties, because neither was amenable to suit in New Jersey.

Also, Yanbu and ECAI must respond by filing a compulsory counterclaim in Delaware. *See* Del. Sup.Ct. R. Civ. P. 13 ("[a] pleading shall state as a compulsory counterclaim any claim which at the time of ... the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim ..."). Thus, the case is properly in Delaware, says SABIC.

Exxon counters that the New Jersey forum is more convenient than any other forum, including Delaware, because SABIC initiated the NJ–I action here first.

Also, SABIC has no connection to Delaware, Exxon is incorporated in New Jersey, and no relevant events took place in Delaware. Further, no witnesses or evidence are found in Delaware. This Court finds that the New Jersey forum is not inconvenient for the parties involved and that this factor weighs in favor of this Court not abstaining.

### c. Desirability of Avoiding Piecemeal Litigation

SABIC claims that the desire to avoid piecemeal litigation here warrants abstention. According to SABIC, if both the New Jersey and Delaware actions proceed to litigate the same issues between the same parties, there will be needless and wasteful duplication of efforts, and possibly inconsistent rulings: abstention by staying or dismissing the second filed "reactive" suit is appropriate.

"[I]t is evident that the 'avoidance of piecemeal litigation' factor is met ... only when there is evidence of a strong federal policy that all claims should be tried in state courts." *Ryan*, 115 F.3d at 197–8; *see also, Colorado River*, 424 U.S. at 819–20, 96 S.Ct. at 1247–1248. (factor was met with evidence of clear federal policy that recognizes the availability of comprehensive state systems for adjudication of water rights); *Moses Cone*, 460 U.S. at 19–20, 103 S.Ct at 939 (factor not met because Federal Arbitration Act did not have clear policy against piecemeal litigation).

This Court finds no clear federal policy here that would give rise to abstention. "The presence of garden-variety state law issues has not, in this circuit, been considered sufficient evidence of congressional policy to consolidate multiple lawsuits for unified resolution in the state courts." *Ryan*, 115 F.3d at 198. Moreover, because there is another closely-related matter being litigated in this forum (NJ–I),

this Court finds that greater judicial economy is served by adjudicating these cases in this forum rather than in Delaware. This Court finds that this factor does not weigh in favor of abstention.

SABIC further argues that circumstances show there is an overriding federal policy to limit piecemeal litigation against foreign states under the FSIA. As discussed, this Court has found that SABIC is not entitled to sovereign immunity under the FSIA. Moreover, even if the FSIA was enacted to protect foreign states like SABIC, there is no indication that the statute demonstrates a preference for state adjudication of claims against foreign states. There are no "exceptional circumstances" favoring abstention with regard to this factor.

### d. Order in Which State and Federal Courts Obtained Jurisdiction

This Court first obtained jurisdiction through SABIC's filing of the NJ–I action in 1998. The Delaware action was filed on July 24, 2000. Pre-trial discovery has begun. The NJ II action was filed in this Court by Exxon on August 3, 2000.[15] Discovery has not yet taken place. SABIC argues that the filing of the Delaware action before the filing of the matter here gives this Court reason to abstain. SABIC's argument is rejected because the NJ–I action was filed before the Delaware action. This Court finds that this factor weighs against abstention.

### e. Source of Law that Governs

The law of Saudi Arabia applies to all of the agreements. (*See* Compl., ¶ 22). This factor is neutral as to whether the matter should be litigated in New Jersey or in Delaware. *See Allied Nut & Bolt*, 920 F.Supp. at 632.

### f. Adequacy of State Court Proceedings

All of the claims, except Exxon's third-party beneficiary claim are in the Delaware action. Delaware Rule of Civil Procedure 13 requires ECAI and Yanbu to plead all compulsory counterclaims in the Delaware action. SABIC says that the Delaware action is adequate to protect the rights of all parties and to provide complete relief. *See Allied Nut and Bolt*, 920 F.Supp. at 632. This Court agrees that the state proceedings are adequate.

### 2. Conclusion

However, when weighing all of the *Colorado River* factors, this Court will *not* abstain because it does not find "exceptional circumstances" that would "justify the surrender" of federal jurisdiction. *Moses Cone*, 460 U.S. at 25–26, 103 S.Ct. at 942. Rather, SABIC essentially argues for this Court's abstention in this case because there are parallel state proceedings. As described, the mere existence of parallel state proceedings does not justify abstention under *Colorado River*.

### E. Third-party Beneficiary Claims

Exxon asserts third-party beneficiary claims on behalf of ECAI, for breach of the Joint Venture Agreement from the alleged royalty overcharges. Exxon claims to be an "intended third-party beneficiary" of these Joint Venture Agreements. (*See* Compl., ¶ 28). SABIC argues that a parent corporation cannot, as a matter of law, assert third-party beneficia-

---

**15.** SABIC neglects to mention that the overcharge issue was already being litigated in the NJ–I action when SABIC filed the Delaware action. In fact, SABIC had already agreed to a consent order that would have required it to respond to overcharge discovery. Instead of responding, SABIC filed the Delaware Action. (Exxon Br. 25, n. 25).

ry status arising solely out of a contract between its subsidiary and another person.

 A third-party cannot sue under a contract to which it is not a party unless it establishes that the contract was directly " 'made for the benefit of [that] party within the intent and contemplation of the contracting parties.' " *Grant v. Coca–Cola Bottling Co.,* 780 F.Supp. 246, 248–49 (D.N.J.1991)(quoting *First Nat'l State Bank of New Jersey v. Commonwealth Fed'l Sav. and Loan Assoc.,* 610 F.2d 164, 170 (3d Cir.1979)). Without such contractual intent and direct benefit, the third-party is merely an incidental beneficiary lacking standing to sue. *Broadway Maint. Corp. v. Rutgers,* 90 N.J. 253, 259, 447 A.2d 906 (1982). Also, a parent corporation is prohibited from claiming third-party beneficiary status under a contract entered into by its subsidiary. Indeed, such claims are routinely dismissed because the purported "benefit" the parent corporation derives is incidental. *See Dow Corning Corp. v. Chem. Design, Inc.,* 3 F.Supp.2d 361, 365–66 (W.D.N.Y.1998).

SABIC urges that Exxon's claim of third-party beneficiary status be dismissed. Any alleged overcharge of royalties under the Unipol sublicenses would go to the KEMYA and YANPET, not Exxon.

 Exxon responds that contrary to SABIC's assertion, it has never alleged that its status as a third-party beneficiary depends, in whole or in part, on its status as the ultimate parent company of either ECAI or Yanbu. Exxon has *alleged* that it is a third-party beneficiary of the Joint Venture Agreements; that is sufficient at this stage in the litigation. *See* Fed. R.Civ.P. 12(b)(6), 8(a). There is no heightened pleading standard for third-party beneficiary claims. Exxon says that the allegation in ¶ 28 of the first amended complaint suffices. This Court agrees.

In addition, Exxon (through its predecessors Exxon and Mobil) was deeply in-

volved in the KEMYA and YANPET ventures since before their inception. While ECAI and Yanbu actually signed the Joint Venture Agreements, Exxon and Mobil representatives were involved in the pre-formation negotiations. Exxon and Mobil signed various agreements annexed to the Joint Venture Agreements, including the Exxon–KEMYA Service Agreement. The Court finds that Exxon may maintain its third-party beneficiary claims.

### F. Jury Demand is Stricken

 Finally, SABIC argues that if any portion of plaintiffs' complaint survives, the jury demand is barred by 28 U.S.C. § 1330, and should be stricken. If jurisdiction is found under Section 1330, the Court's jurisdiction is limited solely to non-jury civil actions. 28 U.S.C. § 1330(a). As noted earlier, SABIC is a foreign state, defined by 28 U.S.C. § 1603(a) and as pled by plaintiffs. (Compl., ¶ 5).

Whenever a plaintiff asserts jurisdiction under Section 1330 and simultaneously makes a demand for jury trial, courts *uniformly* grant motions to strike jury demands. *Universal Consol. Cos., Inc. v. Bank of China,* 35 F.3d 243, 245 (6th Cir. 1994). The jury demand is stricken because of Section 1330 jurisdiction.

### 5. MOTION TO CONSOLIDATE NJ–I AND NJ–II

 Exxon moves to consolidate the NJ–I and NJ–II actions. This Court has already determined that alleged breaches by SABIC and Exxon were based on an "overall agreement" that links all three actions (NJ–I, NJ–II, Delaware Action).

Fed.R.Civ.P. 42 provides:

When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such or-

ders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

Courts in this district have held that Rule 42 does not "demand that actions be identical before they may be consolidated." *In re Cendant Corp. Litig.*, 182 F.R.D. 476, 478 (D.N.J.1998). Rule 42 only requires a "common question of law or fact." *Id.; see also* 8 Moore's Federal Practice, § 42.10 at 42–8 (Matthew Bender, 3d. ed.1997) ("[t]he articulated standard for consolidating two or more cases is simply that they involve a 'common question of law or fact.' ") "Common questions of law and fact do not have to predominate." *Id.* at § 42–10.

The Court enjoys broad discretion in determining whether to consolidate under Rule 42. *See e.g., Blake v. Farrell Lines, Inc.*, 417 F.2d 264, 266 (3d Cir.1969) (affirming consolidation even where overlapping facts resulted in jury trial as to issues of equity). In exercising this discretion, a court should weigh "the interests of judicial economy against the potential for new delays, expense, confusion or prejudice." *Easton & Co. v. Mutual Benefit Life Ins. Co.*, 1992 WL 448794, at *4 (D.N.J. Nov.4, 1992).

This Court exercises its discretion and consolidates the NJ I and II actions. This Court has already held that the NJ–I and II actions arise from the overall Joint Venture Agreement that included the Service Agreement and the Unipol Agreement, the subject of the NJ–I and NJ–II actions respectively. Common questions of law and fact predominate. The interests of judicial economy and avoidance of potential confusion and prejudice favor consolidation.

## CONCLUSION

With respect to the NJ–I motions, the motion for clarification or reformation of the March 10 Stipulation and the motion for partial judgment on the pleadings to strike Exxon's unclean hands and setoff defenses are denied. Exxon's cross-motion to dismiss pursuant to Rule 19 is denied; SABIC is not required to join either ECAI or KEMYA because they are not indispensable parties.

With respect to the NJ–II motions, SABIC is not entitled to immunity under FSIA because of its implied waiver to immunity. In addition, the "commercial activity" exception to immunity applies because SABIC's activities had a "direct effect" in the United States pursuant to 28 U.S.C. 1605(a)(2). This Court has determined that personal jurisdiction exists because of SABIC's consent to personal jurisdiction and its minimum contacts with this jurisdiction. There is sufficient evidence that SABIC was "doing business" in New Jersey and therefore, venue is proper in this District.

Abstention is denied under *Colorado River* because the balance of factors does not meet the exceptional circumstances standard to defeat federal jurisdiction. SABIC's motion to dismiss Exxon's claim of third-party beneficiary status is denied. The jury demand is stricken because SABIC is a foreign sovereign. Finally, the NJ–I and II actions are consolidated.

## ORDER

This dispute concerns the alleged misuse of a patent and alleged overcharges of royalties to a partnership. In Civil Action No. 98–4897(WHW) ("NJ–I"), Plaintiff Saudi Basic Industries ("SABIC") moves to clarify or reform a March 10, 2000 Stipulation and moves pursuant to Rule 12(c) for partial judgment on the pleadings to strike Defendant ExxonMobil's ("Exxon") defenses of unclean hands and set-off. Exxon cross-moves to dismiss the complaint pursuant to Rule 19 for SABIC's failure to join necessary and indispensable parties.

In Civil Action No. 00–3841(WHW) ("NJ–II"), Defendant SABIC moves to dismiss the complaint based on immunity under the Foreign Sovereign Immunities Act, as well as on other jurisdictional grounds. Also, Defendant SABIC moves to dismiss ExxonMobil as a party plaintiff because of lack of standing to assert third-party beneficiary claims and moves to strike the jury demand because of this Court's jurisdiction under 28 U.S.C. § 1330. Plaintiffs Exxon, Exxon Chemical Arabia, Inc. and Mobil Yanbu Petrochemical Company, Inc. move to consolidate the NJ–I and NJ–II actions into a single lawsuit.

For the reasons given in the accompanying Opinion, and for good cause shown, It is on this ___ day of April, 2002:

ORDERED that the motion for clarification or reformation of the March 10 Stipulation is denied;

IT IS FURTHER ORDERED that the motion for partial judgment on the pleadings pursuant to Rule 12(c) is also denied;

IT IS FURTHER ORDERED that Exxon's cross-motion to dismiss pursuant to Rule 19 is denied;

IT IS FURTHER ORDERED that SABIC's motion to dismiss for lack of jurisdiction and venue is denied;

IT IS FURTHER ORDERED that SABIC's motion to dismiss Exxon's claim of thirdparty beneficiary status is denied;

IT IS FURTHER ORDERED that the jury demand be stricken;

IT IS FURTHER ORDERED that the Exxon's motion to consolidate is granted.